UNITED STATES DISTRICT COURT
Southern District of New York

SONY PRO SE OFFICE

2023 AUG -2  PM 4:24

ANTHONY ARRIAGA,
        *Plaintiffs,*

                                        SECOND AMENDED COMPLAINT

- against -                              23-CV-1941 (VB)

                                        **JURY TRIAL REQUESTED**

ANTHONY ANNUCCI
(*Acting* Commissioner for the New York State Department of
Corrections and Community Supervision)
~~Official and Individual Capacity,~~
MICHAEL CAPRA (Superintendent of Sing Sing C.F.)
*Official and Individual Capacity,*
QUANDERA T. QUICK (Inmate Grievance Program Supervisor)
*Official and Individual Capacity,*
ELAINE VELEZ (Deputy Superintendent for Programs/Law Library Administrator)
*Official and Individual Capacity,*
BENNIE T. THORPE (Deputy Superintendent for Security)
*Official and Individual Capacity,*
                Defendants.

**I.    Basis for Jurisdiction**

State below the federal legal basis for your claim, if known.

☑  federal question

☑  Other: Plaintiff herein appears *Pro Se*, and his pleadings are held to less stringent drafting standards than those prepared by attorneys (*Haines v. Kerner*, 404 U.S. 519, 520 [1972]; *Bradley v. Coughlin*, 671 F.2d 686, 689 (2d Cir. 1982). The submissions of a *Pro Se* litigant must be construed liberally and interpreted to raise the strongest arguments that they suggest (*Triestman v. Federal Bureau of Prisons*, 470 F.3d 471).

Which of your federal constitutional or federal statutory rights have been violated?

- Access to the Courts (First Amendment)
- Action for neglect to prevent (42 U.S.C. §1986)
- Conspiracy (42 U.S.C. §1985) – not an individual cause of action
- Defamation of Character: Libel and Slander
- Deliberate Indifference to serious medical needs (Eighth Amendment)
- Equal Protection of the Laws (Fourteenth Amendment)
- Fraud (FRCP Rule (9)(b))
- Free Exercise Clause (First Amendment)
- Gross Negligence
- Gross Negligent Training, Direction, Retention and Supervision
- Negligence
- Negligent Training, Direction, Retention and Supervision
- Prisoner's activities as member of Incarcerated Individual [Inmate] Liaison Committee (First and Fourteenth Amendment)
- Retaliation (First Amendment)
- Retaliatory Transfer (First Amendment); and
- ANY OTHER VIOLATIONS THIS COURT CONSTRUES LIBERALLY AND INTERPRETS TO RAISE THE STRONGEST ARGUMENTS THAT THEY SUGGEST

**II.    Parties**

    **A)    Plaintiff Information**

        Name: Anthony Arriaga
        Aliases: NONE
        ID Number: 06-A-0542
        Current Institution: Sullivan Correctional Facility
        Address: 325 Riverside Drive – Fallsburg, New York 12733
        (845) 434-2080

    **B)    Defendant Information**

Defendant No. 1

| | |
|---|---|
| Name | Anthony Annucci |
| Job or Title (*if known*) | *Acting* Commissioner for the New York State Department of Corrections and Community Supervision |
| Shield Number | |
| Employer | New York State Department of Corrections and Community Supervision |
| Work Address | 1220 Washington Avenue |
| | Albany, New York 12226 |

Defendant No. 2
Name                                      Michael Capra
Job or Title (*if known*)                 Superintendent of Sing Sing C.F.
Shield Number                             _____
Employer                                  New York State Department of Corrections and Community Supervision
Work Address                              Sing Sing Correctional Facility
                                          354 Hunter Street
                                          Ossining, New York 10562

Defendant No. 3
Name                                      Quandera T. Quick
Job or Title (*if known*)                 Inmate Grievance Program Supervisor
Shield Number                             _____
Employer                                  New York State Department of Corrections and Community Supervision
Work Address                              Sing Sing Correctional Facility
                                          354 Hunter Street
                                          Ossining, New York 10562

Defendant No. 4
Name                                      Elaine Velez
Job or Title (*if known*)                 Deputy Superintendent for Programs
Shield Number                             _____
Employer                                  New York State Department of Corrections and Community Supervision
Work Address                              Sing Sing Correctional Facility
                                          354 Hunter Street
                                          Ossining, New York 10562

Defendant No. 5
Name                                      Bennie T. Thorpe
Job or Title (*if known*)                 Deputy Superintendent for Security
Shield Number                             _____
Employer                                  New York State Department of Corrections and Community Supervision
Work Address                              Sing Sing Correctional Facility
                                          354 Hunter Street
                                          Ossining, New York 10562

## III.    Statement of claim

Place(s) of occurrence: explained in the facts of the complaint below and documents obtained through discovery

Date(s) of occurrence: explained in the facts of the complaint below and documents obtained through discovery

**Facts:**

1)    Anthony Arriaga, Plaintiff, an incarcerated individual in the custody of the New York State Department of Corrections and Community Supervision alleges the following:

2)    All defendants and staff mentioned in this complaint are alleged to be acting under color of law and deprived the Plaintiffs of rights, privileges, or immunities secured by the Constitution or laws of the United States.

3)    Defendants and staff mentioned in this complaint have a duty to adhere to **not limited to, but including:**

NYSDOCCS Employee Manual sections:

**§2.1 - Personal Comportment**: No employee, whether on or off duty, shall so comport himself or herself as to reflect discredit upon the Department or its personnel.

**§2.2 - Lawful Comportment**: An employee shall not knowingly or willingly violate any law or ordinance of the United States or the State of New York or any rule, regulation, or Directive of the Department. Any conduct whether occurring on or off duty, which constitutes an "offense" as defined in the New York State Penal Law, or any conduct which alleges the possession and/or use of a controlled substance or marijuana, may be the basis for disciplinary action, regardless of whether an arrest, prosecution or conviction occurred.

**§2.5 - Compliance with orders**: a lawful order given by a superior to a subordinate shall be executed promptly and properly by the subordinate. Thereafter, the subordinate may appeal the order through channels or in accordance with established grievance procedures.

**§3.1** - Supervisory responsibilities shall include, but not limited to, the following:

a. The enforcing of all Agency rules, regulations, policies and procedures governing the operation and administration of the Department.
b. Reporting and documenting violations of Agency policy and procedure promptly.
c. The exercise of responsibility for the appropriate instruction of all their assigned personnel in the methods of performing their official duties.
d. Directing the efforts of subordinate staff and establishing and maintaining all necessary controls to ensure the efficient work performance of assigned personnel.
e. Ensuring that subordinate staff is properly trained to perform the duties to which they are assigned and coordinating with the Albany Training Academy via the chain of command to ensure compliance with the Department's requirements as related to annual training.
f. The timely submission of reports by assigned personnel.
g. Reviewing reports submitted by their assigned personnel and taking appropriate and necessary action to ensure the accuracy of such reports.
h. Prohibiting and reporting unauthorized or criminal activity on State and/or Department property.
i. Ensuring adequate staff coverage within the particular jurisdiction or area of responsibility.
j. Submitting probationary reports and performance evaluations in accordance with Agency policies and in a timely manner.
k. Ensuring the timely and accurate submission of expense accounts and attendance records.
l. Performing the supervisory responsibilities as directed.
m. Protecting the integrity and mission of the Department and modeling appropriate conduct, ethics, and performance.
n. Ensuring fairness and equity in employment related activities.

**§3.2** – Supervisory and managerial personnel who fail to take prompt and immediate steps to prevent and/or report discrimination or harassment or an act of retaliation as a result of reporting discrimination or harassment may be subject to disciplinary action.

**§4.16 - Falsification of records**: No employee shall knowingly make a false or inaccurate official report or statement, orally or in writing, or make, maintain, cause, or permit to be made a false or inaccurate record or false or inaccurate entry in official records or omit or fail to disclose pertinent facts.

4) Plaintiff believes the following causes of action are applicable to this complaint (**not limited to, but including**):

- Access to the Courts (First Amendment)
- Action for neglect to prevent (42 U.S.C. §1986)
- Conspiracy (42 U.S.C. §1985)
- Defamation of Character: Libel and Slander

- Deliberate Indifference to serious medical needs (Eighth Amendment)
- Equal Protection of the Laws (Fourteenth Amendment)
- Fraud (FRCP Rule (9)(b))
- Free Exercise Clause (First Amendment)
- Gross Negligence
- Gross Negligent Training, Direction, Retention and Supervision
- Negligence
- Negligent Training, Direction, Retention and Supervision
- Prisoner's activities as member of Incarcerated Individual [Inmate] Liaison Committee (First and Fourteenth Amendment)
- Retaliation (First Amendment)
- Retaliatory Transfer (First Amendment); and
- ANY OTHER CAUSES OF ACTION AND VIOLATIONS THIS COURT CONSTRUES LIBERALLY AND INTERPRETS TO RAISE THE STRONGEST ARGUMENTS THAT THEY SUGGEST

❖ **ACCESS TO THE COURTS**
❖ **EQUAL PROTECTION OF THE LAWS**
❖ **ERRONEOUS REMOVAL OF PLAINTIFF FROM LAW LIBRARY ASSIGNMENT**
❖ **GROSS NEGLIGENCE, GROSS NEGLIGENT HIRING TRAINING, DIRECTION, RETENTION AND SUPERVISION**
❖ **INTERFERENCE WITH THE WRIT OF HABEAS CORPUS**
❖ **LEGAL ASSISTANCE (Legal Assistant – Client Relationship)**
❖ **NEGLECT TO PREVENT OR INTERVENE**
❖ **NEGLIGENCE, NEGLIGENT HIRING TRAINING, DIRECTION, RETENTION AND SUPERVISION**
❖ **WRONGFUL CLASSIFICATION OF ALL LAW LIBRARIES AS SECURITY SENSITIVE**

5) On or about February 22, 2019, Defendant Annucci, issued a memorandum – KIPY Length of Stay Reports. The length of stay memorandum (in sum and substance) states that individuals that have remained in a sensitive or preferred work assignment for over 36 months may be removed.

6) On or about May 2019, Plaintiff was wrongfully removed as a law library clerk at Sing Sing C.F.'s law library due to DOCCS 36 month – length of stay memorandum.
Law libraries have never been deemed sensitive or preferred work assignments and law clerks have never been removed in 6-month periods pursuant to Directive #4803(IX)(B)(4) prior to the length of stay memorandum.

7) At the time of removal, Plaintiff had only been assigned as a law library clerk from April 16, 2018 thru May 12, 2019; less than 36 months.

8) Plaintiff made an appeal/complaint to L. Malin (DSP) regarding Plaintiff's erroneous removal from the law library. On or about May 10, 2019, L. Malin replied that Plaintiff was removed due to a new length of stay regulation and his removal was mandated; which was false.

9) Plaintiff asserts that he could have remained under the KIPY length of stay justification code 06 – no security threat noted with continued placement and under the Racial and Ethnic Balance Report being that at most he was only 1 of 2 bilingual (English and Spanish speaking clerks) for the entire population. There were points in time, Plaintiff was the only bilingual clerk. The only other bilingual clerks throughout Plaintiff's portion of his assignment as a clerk (at intervals) were Candido Baez and Lorenzo Martinez.

10) On or about May 23, 2019, Plaintiff filed a grievance #60924-19, complaining about numerous Directives policies, regulations were arbitrary and capricious and an abuse of discretion. An IGRC hearing was held on or about June 6, 2019. On or about June 7, 2019, the IGRC issued a decision stating that Plaintiff's former work assignment has been considered security sensitive and petitioner could be removed after six months. Plaintiff appealed this decision to the Superintendent and the Superintendent denied Plaintiff's grievance stating, based upon the length of stay memorandum for the overall safety, and security along with the complacency and overfamiliarity with staff, those incarcerated may be removed from their program due to their length of stay. On or about July 23, 2019, Plaintiff appealed to CORC and on or about September 3, 2020, the CORC upheld the determination and declined to revise department policy regarding inmate program placement.

11) Plaintiff also asserts that law library clerks have never been removed within 6 month periods (Directive #4803(IX)(B)(4)) as the grievance response indicated. Upon information and belief, a review of the program change assignment history of all law library clerks (prior to the 36 month-length of stay) will show that they were never removed within 6 months due to law libraries being deemed security sensitive.

12)   Plaintiff asserts that the legal assistant-client relationships he has/had is a contract and constitutionally binding throughout the litigation they were approved to perform by the law library supervisor or law library administrator (DSP) which is an NYS DOCCS contractual form that all legal assistant-client and supervisors approved and agreed to.

13)   The incarcerated individuals that Plaintiff was assigned to [legal assistant-client relationships] were left with no choice but to find another legal assistant that was: less experienced, not familiar with their cases, not bilingual and basically have to start from scratch; thereby prejudicing their legal claims and minimizing their chances of success.

14)   On or about August 24, 2020, Plaintiff was reassigned as a law library clerk (based upon facility need) at a lower rate of pay wages than when he was removed from the program.

15)   At the time of Plaintiff's removal as a law library clerk (Administrative/Bilingual Clerk/Paralegal) was assisting numerous individuals (some only Spanish speaking) with all sorts of legal issues stemming from administrative issues, grievances, criminal appeals, civil proceedings, Court of Claims issues, civil discovery, criminal appeals, Federal Discovery, 42 USC §1983 (Civil Rights Complaints), Article 78's, Disciplinary Hearings: defenses and appeals, translating (from English to Spanish and vice versa), administrative clerk duties, etc. The specific names of all the individuals Plaintiff was assisting are all in Plaintiff's files which are stored in the facility law library supervisor's file cabinet.

16)   Plaintiff vaguely remembers the names of all his clients (not limited to, but including) and issues assisting them with as being:
Antwon Dennis - criminal post-conviction motion (C.P.L. §440.10)
Brian Rivera - Claim and C.P.L. §440.47
Dennys Acevedo*[1] - Immigration
Harry Rivera - criminal post-conviction motion (C.P.L. §440.10)
Jian Lin - Parole
Jose Tayo* - C.P.L. §440.47
Julian Silva - immigration and criminal post-conviction motion (C.P.L. §440.10)
Kalieh McMorris - criminal post-conviction motion (C.P.L. §440.10), Habeas Corpus
Louis Rodriguez - criminal post-conviction motion (C.P.L. §440.10)
Mark Richardson - Habeas Corpus, Claim
Michael Hoffler - criminal post-conviction motion (C.P.L. §440.10)
Michael Jones - Civil Rights Complaint (42 U.S.C. §1983)
Rene Bonilla - criminal post-conviction motion (C.P.L. §440.10)
Riad Dib* - Immigration and criminal post-conviction motion (C.P.L. §440.10)
Valerie LaTouche - criminal post-conviction motion (C.P.L. §440.10)
Wilfredo Aviles - criminal post-conviction motion (C.P.L. §440.10)

17)   Plaintiff claims that he is and was ethically and constitutionally bound to the incarcerated individuals he was assisting and asserts that law libraries cannot be "all of a sudden" deemed security sensitive since they are constitutional in nature and that law libraries have never been deemed security sensitive throughout the history of NYS prisons and departmental directives. Furthermore, the removal of Plaintiff denied the Spanish speaking population legal assistance.

18)   Defendants, acting under color of law, removing Plaintiff and other law library clerks violated (not limited to, but including) access to the courts, the constitutional right to legal assistance, interfering the Writ of Habeas Corpus, etc.

---

[1]   * means that these individuals dominant language is Spanish or are limited English proficient according to NYSDOCCS Departmental Directives

19)     On or about February 2021, Plaintiff commenced an Article 78 proceeding (*Arriaga v. Malin, et al.*, Albany County Index No. 1873-21 and on June 16, 2021, Hon. Patrick J. McGrath dismissed the petition which was entered and filed on or about June 29, 2021.

20)     On or about July, 2021, Plaintiff filed a timely notice of appeal to the Appellate Division, Third Department (*Arriaga v. Malin, et al.*, Appellate Division Docket No. 533900). Plaintiff filed a brief on or about May 23, 2022, and Respondent's brief was filed on or about August 26, 2022. A determination was rendered on January 12, 2023.

## COVID-19 ISSUES - DELIBERATE INDIFFERENCE, NEGLIGENCE, NEGLIGENT HIRING TRAINING, DIRECTION, RETENTION AND SUPERVISION, GROSS NEGLIGENCE, GROSS NEGLIGENT HIRING TRAINING, DIRECTION, RETENTION AND SUPERVISION EQUAL PROTECTION OF THE LAWS

21)     Since COVID-19 was observed in New York City/State, correctional staff entering Sing Sing C.F. were not: having their temperature checked, tested for COVID-19 although having flu-like and COVID-19 symptoms (clearly coughing/sneezing, etc.), not wearing masks, congregating without masks while working in the confines of Sing Sing C.F.

22)     In January 2020, the United States publically acknowledged, via news outlets, a man from Washington State, was diagnosed with novel COVID-19.

23)     On or about January 30, 2020, the World Health organization declared COVID-19 a public health emergency of international concern.

24)     On or about February 26, 2020, the Centers for Disease Control and Prevention confirmed a COVID-19 case out of California, of a person without travel history.

25)     On or about February 29, 2020, the first COVID-19 death was reported in Washington State.

26)     On or about March 1, 2020, New York State confirmed it's first COVID-19 case out of Mt. Sinai Hospital in Manhattan, New York County by Dr. Angela Chin.

27)     On or about March 3, 2020, New York State confirmed it's second COVID-19 case out of New Rochelle, Westchester County.

28)     On March 5, 2020, James O'Gorman (Deputy Commissioner for Correctional Facilities) issued a memorandum specifying to "report any symptoms promptly". This memorandum was not adhered to by staff or supervisors.

29)     On or about March 7, 2020, Governor Andrew Cuomo declared a state of emergency in New York after approximately 89 cases had been confirmed in the State, approximately 70 of which spurned out of Westchester County.

30)     On or about March 11, 2020, the World Health Organization publicly declared COVID-19 as a pandemic.

31)     On March 12, 2020, Mayor DeBlasio declared a state of emergency in New York City.

32)     On March 12, 2020, there are 325 positive cases in New York State, there are 95 cases in New York City[2].

33)     On March 14, 2020, Anthony Annucci (NYSDOCCS Acting Commissioner) issued a memorandum ceasing all visitation at all NYSDOCCS correctional facilities for incarcerated individuals effective immediately at 5 p.m. of this day; including Family Reunion Programs.

34)     As of March 14, 2020, when all visitation was cancelled at Sing Sing C.F.; there was absolutely no cases of COVID-19 in the facility.

35)     On or about March 15, 2020, Governor Andrew Cuomo publically announced New York school closures, namely schools in Westchester County will be closed as of March 16, 2020.

---

[2] *Novel Coronavirus (COVID-19)*, New York State Department of Health (March 12, 2020) at https://on.ny.gov./2vfFOvy (updated regularly)

36) On or before March 17, 2020, it was publically reported, via NBC News, defendant's employee, a correction officer at Sing Sing C.F. tested positive for COVID-19.

37) On or about March 18, 2020, Governor Andrew Cuomo effected a state wide stay-at-home order, also known as the NYS on Pause Program, with a mandate that all non-essential workers work from home beginning at 8 p.m. on March 22, 2020.

38) The actions of NYSDOCCS staff/defendants, acting under color of law, failed to act with "reasonable care" to mitigate a risk created by a seriously threatening condition, even though the responsible authorities knew or should have known that the condition posed an excessive risk to the health and safety of the inmates. There can be no doubt that the presence of a communicable disease in a prison can constitute a serious, medically threatening condition. The current epidemic poses a deadly threat to inmates, and it's presence at the prison equates to an "unsafe, life-threatening condition" endangering "reasonable safety".

39) On or about March 30, 2020, Juan Renzo Mosquero (12-A-1601) assigned as a law library porter, passed away from COVID-19 at Sing Sing C.F. Upon information and belief, Mr. Mosquero was the first incarcerated individual that passed away. Other incarcerated individuals and staff that unfortunately passed away from COVID-19 at Sing Sing C.F.: Calvin Grohoske (DIN: 15-A-3952), Mr. Ford (DIN: 18-A-1026), Ramon Escobar (DIN: 17-A-0317) and C.O. Ronnie Goss.

40) On March 31, 2020, the NYS Department of Health issued "Protocols for essential personnel to return to work following COVID-19 exposure or infection". Correctional staff at Sing Sing C.F. failed to adhere to the following protocols:
   - §4 – Staff were not having their temperatures checked every 12 hours;
   - §5 – Staff was observed without face masks knowing they would be working within 6 feet of individuals and not wearing any face masks;
   - §7 - Personnel developing symptoms consistent with COVID-19 remained at work;
   - §8 – Testing is not being provided for essential personnel with symptoms.
   
   **Confirmed or suspected COVID-19**
   - §3 – Personnel who are recovering from COVID-19, and return to work, must wear a facemask for 14 days following the onset of illness.

41) On April 2-5, 2020, Plaintiff was awake all night turning and tossing due to sweating profusely, followed by having freezing cold chills and lightning strike feelings in his chest while he was breathing with extreme fatigue. Plaintiff placed a sick call slip in the sick call mailbox each day requesting to see a nurse. Plaintiff was never called to sick call. Upon information and belief, Plaintiff was sick with COVID-19 form April 2-5, 2020.

42) The health of prison inmates is the business of governments who incarcerate them. Indeed, it has long been settled that the United States Constitution requires the government to provide effective medical care for inmates.

43) It is well settled that an inmate, who "must rely on prison authorities to treat [the inmate's] medical needs" "has a fundamental right to 'reasonable' ...and 'adequate' medical care".

44) On or about April 7 – May 9, 2020, Plaintiff completely lost his senses of taste and smell.

45) Effective April 9, 2020, Defendants issued a policy that staff are to wear masks while on duty whenever entering any of the correctional facilities, and further allowed the inmate population to use their state-issued handkerchiefs as masks.

46) That on April 17, 2020, there existed in full force and effect within the State of New York, Sessions Laws of New York, Executive Order No.202.17, "Effective at 8 p.m. on Friday April 17, 2020, any individual who is over age two and able to medically tolerate a face-covering shall be required to cover their nose and mouth with a mask or cloth face-covering when in a public place and unable to maintain, or when not maintaining, social distance." This order was not being adhered to by staff at Sing Sing C.F.

47) The defendants (staff at Sing Sing C.F.) had a duty to comply with the provisions of Sessions Laws of New York, Executive Order No. 202.17.

48) The defendants (most staff at Sing Sing C.F.) violated the provisions of Sessions Laws of New York, Executive Order No. 202.17 by not complying.

49) "Communicable diseases could not ask for a better breeding ground than a crowded prison. Prisoners eat in communal dining rooms. Many have a neighbor who sleep less than six feet to the side. Much of the space is so cramped that the inmates are physically unable to stay far enough from their fellow prisoners to be safe from the risk of contagion. Even individuals without apparent COVID-19 symptoms can spread disease in all these areas and situations. Certainly, no American prison is equipped to deal with a health crisis of the severity of this one" (quoting, *People of the State of New York ex rel. Stoughton v. Brann*).

50) Plaintiff and all other similarly situated incarcerated individuals at Sing Sing C.F. during the COVID-19 pandemic, were not issued or allowed to receive even through the package room, appropriate face masks (N-95 or it's equivalent) and a sufficient amount of cleaning supplies to disinfect his cell or the prison of COVID-19.

51) In *Ramsundar v. Wolf*, 2020 WL 1809677 [W.D.N.Y. 2020] ordered that Respondents are restrained from ending any of the following social distancing and other protective measures, staff and officer's to wear masks whenever interacting with prisoners.

52) During the month of April 2020 and thereafter, prisoners that were housed in other correctional facilities (not limited to, but including Shawangunk and Queensboro) with COVID-19 and coronavirus symptoms were transferred to Sing Sing C.F. (Infirmary and HB5) for unknown reasons and then released into Sing Sing C.F. general population without getting tested again to see if they were no longer positive for COVID-19.

53) Medical staff should have issued follow-up appointments to check on the status of Plaintiff and others released from infirmary and HB5; testing for and possible spread of COVID-19.

54) On or about May 2020, incarcerated individuals that were sick and sent out of the facility for medical treatment were returned and quarantined for 3 days in HB5 due to them leaving the facility. All the correctional staff that transported these incarcerated individuals to and from the facility were never placed on quarantine status like the incarcerated individuals were and stayed on duty which violated equal protection and were deliberately indifferent to Plaintiff. Staff are not immune from COVID-19.

55) Upon information and belief, on or about May 2020, Plaintiff went to see his health care provider (V. Monroe, N.P.) and relayed the symptoms he went through; believing that he already contracted COVID-19. Plaintiff requested for an antibody test but was denied based upon DOCCS not doing or providing any antibody testing.

56) On or about May 2, 2020, Sing Sing staff began to initiate social distancing lining up in the hallways to go to the yard by putting down blue tape and spacing them approximately 6 feet apart (at the HB5 gate prior to walking through the magnometer). However, lining up in HBA prior to entering the hallway/corridor, there are no lines and crowding continues in violation of social distancing.

57) On or about May 6, 2020, at approximately 9:30 a.m. there was an announcement over the P.A. system specifying, "any staff that wants to take an antibody test call extension number (inaudible)".

58) On or about May 6, 2020, correctional staff posted social distancing signs and placed blue tape down spaced at approximately 6 feet apart throughout the facility; however, staff did not enforce these lines or social distancing.

59) On or about May 7, 2020, correctional staff issued men in population white cloth face masks [not N-95].

60) Upon information and belief, on the Sing Sing C.F. May 2020 ILC Agenda, HBA ILC Rep. Vincent Warren (DIN: 01-A-3241) brought forth the following issues:

- When men in the facility became sick (symptoms of COVID-19) their neighbors housed less than 6 feet apart) were not tested, checked or quarantined. There was no contact tracing that the population is aware of and men in population have voiced their concerns about this.
- The men that are being released from the infirmary are not given a second test before they are returned back to population to assure that they are no longer positive.
- Correction Officer's are constantly grouped up without masks on their face, which is contrary to Sessions Laws of New York, Executive Order No.202.17.

**Suggestions:**
- Population and staff that test positive for COVID-19 be retested before they are released back into population or return for duty.
- That there be contact tracing (i.e. when someone is found to have COVID-19, that their neighbors be tested or examined by medical staff if they are unable to be tested).
- That all officers be mandated to wear masks when they are unable to maintain a six-foot distance from one another or from the inmate population.

61) Sing Sing is just one of the more than 50 NYS prison facilities. It currently accounts for approximately 12% of confirmed COVID-19 infections and approximately 26% of confirmed COVID-19 deaths among individuals in DOCCS custody[3].

62) On or about May 9, 2020, Plaintiff first gained a sense of smell and taste after contracting COVID-19. At times, Plaintiff gains a slight sense of smell and taste. Till present date, Plaintiff has not completely recovered these senses; deemed "long COVID".

63) Upon information and belief, as of May 11, 2020, there have been 30,240 people that have tested positive and 1,116 people that died due to COVID-19 in Westchester County.

64) On or about May 12, 2020, Lt. Brian Bodge (Acting Captain) issued a memorandum mandating all inmates to wear masks when utilizing the phones throughout the facility.

65) On or about May 13, 2020, correctional staff issued men in population another white cloth facemask [not N-95].

66) On or about June 17, 2020, Plaintiff filed a grievance #311-20 specifying the following:
Since April 2, 2020, I have been attempting to see a nurse or my health care provider. I have sent numerous letters and sick call slips but have not been placed on sick call or been issued a callout to see my health care provider to address my medical concerns.
Action requested:
To not be denied medical care
To not be delayed medical care
To be issued a callout as soon as possible to see my health care provider

67) It was not until on or about July/August 2020 that Plaintiff and other similarly situated incarcerated individuals began getting tested for COVID-19.

68) On or about October 24, 2020, Plaintiff filed grievance #585-20 specifying the following:
I was keep locked from October 12-13, 2020 (4p.m.-9p.m.), and then quarantined in HB5-A-Gallery also known as the quarantine unit for COVID-19 inmates (hereinafter referred to as "unit") on October 15-24, 2020, to be quarantined based upon me being in the law library while C.O. McCleod was working on October 9, 2020.
On October 19, 2020, at approximately 9:30 a.m. Dr. Felix Ezekwe informed me and all others on the unit that our test results were negative.
On October 20, 2020, I asked Dr. Felix Ezekwe, "Who is it that still has me quarantined after I tested negative?" Dr. Ezekwe replied, "The State". I then replied, "I need a specific name of a person". Dr.

See *NYS DOCCS Incarcerated Individuals COVID-19 Report by Housing facility as of May 9, 2020 at 3:00P.M.*, http://doccs.ny.gov/system/files/documents /2020/05/doccs-confirmed-incarcerated-population-by-facility-may-9-2020.pdf.

Ezekwe again replied, "The State, Albany." I then informed him, Under the Patients Bill of Rights I am entitled to know of the name of the person who exactly has me quarantined, do you really want to violate this state regulation (10 N.Y.C.R.R. §405.7(c)(2), (c)(3), (c)(5), (c)(6), (c)(8)).

The issues mentioned can be corroborated by those quarantined with me during this period: (G. Spencer 89-A-3902, S. Brathwaite 94-A-0476, R. Griffin 00-B-2844, R. Bonilla 07-A-3828, J. Jefferson 03-A-0148).

Action requested:

An investigation to be conducted and Dr. Felix Ezekwe to reply to this grievance (Directive #4040 §701.2(i)).

Dr. Felix Ezekwe to not violate my Patient Bill of Rights.

Dr. Felix Ezekwe to inform me as to the person "Albany/The State" that kept me quarantine after I tested negative.

69)     On October 29, 2020, Plaintiff filed a grievance #605-20 specifying the following:

On or about October 24, 2020, Plaintiff filed grievance #585-20 specifying the following:

I was keep locked from October 12-13, 2020 (4p.m.-4p.m.), and then quarantined in HB5-A-Gallery also known as the quarantine unit for COVID-19 inmates (hereinafter referred to as "unit") on October 15-24, 2020.

I was quarantined based upon me being in the law library while C.O. McCleod was working (October 9, 2020). I believe that I was singled out and discriminated against because I am a prisoner and staff was not quarantined for contact tracing.

On October 16, 2020, I had a callout for lab (6:30 a.m.) and a callout for V. Monroe (1:00 p.m.). I was not allowed to go to either callout which was in the hospital.

On October 19, 2020, at approximately 9:30 a.m., Dr. Felix Ezekwe informed me and all others in the unit that our COVID-19 test results were negative.

All of the issues mentioned can be corroborated by those quarantined with me during this period: (G. Spencer 89-A-3902, S. Brathwaite 94-A-0476, R. Griffin 00-B-2844, R. Bonilla 07-A-3828, J. Jefferson 03-A-0148).

The unit should be ran with a higher level of care, medical care and standards (CDC guidelines for prisons and Correction Law §141) but it is not. I complained to staff regarding the following disturbing issues in the unit. However, none of the issues were rectified throughout the entire time I was in the unit:

1)    I produced 2 hospital mandatory callouts to staff and my name is specified on the master callout sheet but I was never sent or escorted to the hospital.

2)    HB5-A-Gallery is being utilized as a punishment towards people that are sick or possibly sick.

- Specifically, there were 2 men (R. Bonilla and another inmate) housed in the unit that were quarantined allegedly because of a visit related (issue(s)). However, neither of these men were tested for COVID-19 and were released back into population.

- I was quarantined and being provided with only ½ hour out of my cells to utilize the phone, shower and kiosk. When inquiry was made as to why we were on such an extreme lockdown, correctional staff stated that this direction was made per Sgt. Martinez.

- There is no P&P, Directive, memorandum, etc. as to how to run this unit.

- I was not allowed to partake in daily outdoor exercises from October 15-24, 2020, in violation of 7 N.Y.C.R.R. §1704.6(b).

- An inmate was brought into the unit on October 22, 2020, that was potentially sick with COVID to be around me and everyone else that tested negative; endangering my health and safety.

- The CDC guidelines for prisons and Executive Order 202.8 as amended by all other preceding orders titled to Continuing Temporary Suspension and Modification of Laws Relating to the Disease Emergency are not being adhered to.

3) I was placed in a dirty cell (COVID lives on surfaces) and there are no rags, mops, or dustpans to clean, sanitize or disinfect my cell or the unit;

4) There are no hand sanitizer stations;

5) The bleach spray bottles supplied are diluted (ineffective to clean and disinfect against COVID-19);

6) No laundry services;

7) Shower area smells like mildew and is filthy (It is noteworthy that COVID-19 is a respiratory illness);

8) The unit was never mopped or swept and shower never cleaned, sanitized or disinfected;

9) No law library services in violation of my constitutional right to access to the courts (I received 2 pieces of legal mail which required a reply to active legal deadlines during my quarantine and could not reply while on quarantine)

10) No Wi-Fi to utilize the phone app and Westlaw on my tablet to allow for precautions surrounding COVID;

11) Cold food in fee-up trays;

12) No paper, pens and envelopes issued on the unit in violation of 7 N.Y.C.R.R. §1704.9;

13) No clothes line to hang up clothes (P&P #500(IV)(B)(5);

14) Medical staff never wiped down blood pressure test in my presence before & after testing me.

Action Requested:

1) I should not be denied any medical care when I have a mandatory callout. All hospital callouts are mandatory as stated on the callout.

2) Everyone quarantined in the unit should be tested. Inmates in the unit should not be on lockdown status for approximately 23½ hours a day; inmates go to this unit because they are sick or could have been exposed to COVID not due to disciplinary reasons. A P&P should be made so the men in the unit are provided with knowledge on how the unit should be ran in accordance with state regulations. Inmates that test negative should not be exposed to others that are potentially positive. The CDC guidelines for prisons and Executive order 202.8 as amended should be adhered to.

3) There should be cleaning supplies available to clean and disinfect the cell and unit.

4) Hand sanitizer stations need to be installed in the unit.

5) Bleach spray bottles solution should be mixed properly so that it is effective against COVID.

6) Washer and dryer should be installed on the unit to provide for laundry services and to prevent the spread of COVID to the population since COVID lives on surfaces.

7) Showers should be thoroughly cleaned and disinfected daily.

8) The unit should be mopped and swept daily.

9) A mini law library should be implemented on the unit to provide the constitutional of access to the courts and not spread COVID.

10) Wi-Fi ability should be enabled to utilize the phone app and Westlaw to maintain social distancing and further precautions for COVID.

11) Hot food should be served in feed-up trays.

12) Papers, pens, and envelopes should be issued.

13) Hooks should be placed in each cell and clothes lines should be issued in the unit.

14) Medical staff must clean and disinfect blood pressure test before & after each use with appropriate sanitizer or disinfectant before testing each individual.

56) While Plaintiff was quarantined in the unit, no supervisor was ever seen making rounds except for Sgt. Riley (at times; very early in the morning). Additionally, there was no observation being done while being housed in the unit. At best, Plaintiff's temperature would be checked twice a day.

57) On November 27, 2020, Plaintiff filed a grievance regarding their being no bleach spray bottles in HB7 from November 20-27, 2020 to sanitize and disinfect the phones.

58) On or about November 3, 2021, Plaintiff tested positive for COVID-19 and was sent to the unit.

59) On November 7, 2021, Plaintiff's mother called the facility and spoke to a person by the name of Soto, filing a complaint about there being no heat and windows in unoccupied cells being left wide open in the unit.

60) From November 4-16, 2021, Plaintiff was quarantined again in the unit.
On or about November 26, 2021, Plaintiff filed grievance #800-21
The conditions in the unit complained of were as follows:
- The CDC guidelines for prisons are not being adhered to;
- From November 4-11, 2021, there was cold air coming through the ventilation system and the neighboring cells in the unit had their windows open allowing for the entire unit to be very cold not allowing Plaintiff to sleep.
- There are no hand sanitizer stations;
- The bleach spray bottles supplied are diluted (ineffective to clean and disinfect against COVID-19);
- No laundry services;
- Shower area smells like mildew and is filthy (It is noteworthy that COVID-19 is a respiratory illness);
- The unit was never mopped or swept and shower never cleaned, sanitized or disinfected;
- No law library services in violation of my constitutional right to access to the courts (I received a notice from the Court of Claims which required a correction to an error).
- No Wi-Fi to utilize the phone app and Westlaw on my tablet to allow for precautions surrounding COVID;
- Cold food in feed-up trays;
- No papers, pens, envelopes issued in the unit in violation of 7 N.Y.C.R.R. §1704.9;
- No clothes line to hang up clothes;
- I was previously quarantined in this unit from October 15-24, 2020, and the conditions were basically the same even though numerous individuals filed grievances (#605-20) and complaints.

61) On December 13, 2021, Plaintiff filed an appeal to the Superintendent for grievance #800-21.

62) During the pandemic thru July 17, 2022, Plaintiff consistently observed the following Sing Sing C.F. staff and others whose names Plaintiff is unaware of walking around without a mask: Sgt. Martinez, C.O. P. Siegler. The following staff were always seen congregating without a mask in the HBA OIC area: C.O. Ellis, C.O. Brown, C.O. Bailey, etc.. Upon information and belief, other incarcerated individuals similarly situated/affected have observed these and other staff members walking around without a mask and/or while these staff were showing symptoms of being sick (coughing, sneezing, looking fatigued and walking around fatigued).
Defendants and Staff failed to: maintain masks on their faces, enforce that all staff and population maintain masks on their faces, distribute effective masks (N-95, KN-95, etc.), allow I/I's to receive effective masks via packages, enforce social distancing, seat I/I's at 6 feet apart during meal runs, add phones that are 6 feet apart, install hand sanitizer stations or dispensers next to the phones, have bleach available to clean the phones after each person uses them, comply with CDC guidelines for prisons, provide COVID tests, etc.
Defendants and Supervisors failed to: maintain masks on their faces, enforce that all staff maintain masks on their faces, distribute effective masks (N-95, KN-95, etc.), allow I/I's to receive effective

masks via packages, enforce social distancing, seat I/I's at least 6 feet apart during meal runs, add phones that are at least 6 feet apart, install hand sanitizer stations or dispensers next to the phones, have bleach available to clean the phones after each person uses them, comply with CDC guidelines for prisons, provide COVID tests, etc.

Other similarly situated incarcerated individuals are most likely still enduring the same circumstances complained of.

Plaintiff faced risk to exposure and contracted COVID (knowingly) at least 3 times from the beginning of the pandemic thru July 17, 2022 while he was housed at Sing Sing C.F.

63) During the pandemic, the Defendants and medical staff filed false percentage rates and # of individuals that were positive with COVID-19 at Sing Sing C.F. Plaintiff asserts that **at least 75%** of the prison population was infected with COVID-19 and that most individuals were not receiving any medical care.

64) Indeed, Plaintiff did not suffer from any of the aforementioned injuries (exposure, infection, substandard conditions of the unit, etc.) until after aforementioned actions or omissions by the defendants and subordinates towards Plaintiff; which was the proximate cause for contracting and suffering injury from the deadly virus (COVID-19).

65) Plaintiff fortunately did not succumb to the demise of the deadly virus. However, the actions and omissions by said defendants, illustrates that they should be held liable for their constitutional violations.

66) Plaintiff contracted COVID-19 at least three (3) times while at Sing Sing C.F. due to the violations and lack of everything not being 6 feet apart.

**While Plaintiff was confined at Sullivan C.F.:**

67) In Sullivan C.F., the phones and cells are not 6 feet apart. There is no bleach and hand sanitizer available at all times. Social Distancing is not adhered to.

68) On or about October 4-15, 2022, Plaintiff's housing unit (A-South) was placed on quarantine for COVID-19 (23-hour lock down).

69) On October 6, 2022, Plaintiff was randomly tested for COVID-19.

70) On October 7, 2022, Plaintiff came out positive for COVID-19 and sent to the infirmary from October 7-11, 2022, to a 4-man room (24-hour lockdown) with absolutely nothing to do in this room except look at the walls. There was no TV's in the room, denied: indoor and outdoor recreation, possession of non-cooking food (tea, soup, cough drops, oatmeal, coffee, tuna, etc.), hot pot/hot water, purchasing commissary, razor to shave, correspondence with family and lawyers, stationary supplies, personal access to the kiosk, law library tablet, violation of Patient Bill of Rights (10 N.Y.C.R.R. §405.7(c)(3), (8-9), and (14), etc... the Infirmary P&P or FOM #5010, updated COVID protocols and updated CDC Guidelines for Prisons.

71) On or about October 10, 2022, Plaintiff filed grievance #444 regarding this matter. The grievance was consolidated with numerous other individuals. The IGRC agreed with Plaintiff and other incarcerated individuals which were similarly situated/affected that grieved the same conditions.

72) Defendant Annucci and Sullivan C.F. medical staff: Mrs. Paige-Cannonier (Nurse Administrator) and J. Krom (Deputy Superintendent for Administration), while acting under color of law allowed for these violations to continue to occur.

73) Men housed in the SHU are afforded way more privileges than Plaintiff being confined to this room 24 hours a day; thereby penalizing me for being sick. In all other facilities where Plaintiff was housed, he would be allowed to have all the aforementioned property and privileges while being quarantined in the infirmary and in the unit.

74) Additionally, there was no observation being done while being quarantined in the infirmary and A-North, at best, our temperature would be checked twice a day. Plaintiff did not receive any observation or have his temperature checked or seen by anyone the weekend of October 15 – 17, 2022; which Plaintiff complained to the gallery officer about.

75) On October 11, 2022, Plaintiff was transferred out of the infirmary to A-North, 233 cell on lock down for 23 hours a day; with one hour to daily access the phone, shower and kiosk.

76) On the October 2022 and November 2022 ILC Agenda, the ILC at Sullivan C.F. brought forth the matters regarding the conditions of confinement mentioned in this paragraph as the ILC Chairman was also quarantined during the same period as Plaintiff.

77) Plaintiff contracted COVID-19 at least three (1) time while at Sullivan C.F. due to the violations and lack of everything not being 6 feet apart; similar to the circumstances Plaintiff underwent at Sing Sing C.F.

78) Plaintiff contracted COVID-19 at least four (4) times while being incarcerated at Sing Sing C.F. and Sullivan C.F. due to the violations mentioned and lack of everything not being 6 feet apart.

## DENIAL OF CATHOLIC SERVICES - FREE EXERCISE CLAUSE, EQUAL PROTECTION OF THE LAWS

79) On or about March 15, 2020, Catholic Services was suspended in Sing Sing C.F.

80) On or about November 26, 2020, Plaintiff attempted to have Catholic Services reinstated by sending Father Matthew and Defendant Capra a copy of the case (*Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S.Ct. 63) which showed, upon information and belief, that Catholic Services should have commenced on November 25, 2020 and that Respondent Gov. Cuomo is enjoined from enforcing Executive Order 202.68's, 10 and 25 person occupancy limits which violates the free exercise clause of the First Amendment.

81) On or about December 28, 2020, Plaintiff filed a grievance #656-20 due to the violation of Plaintiff's free exercise clause of the First amendment including that it is irreparable harm in that, the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury. Plaintiff received a CORC determination. Therefore, Plaintiff has exhausted his administrative remedies via the grievance process on this matter.

82) On or about February 27, 2021, Catholic Services was reinstated at Sing Sing C.F.

83) Plaintiff was denied his First Amendment freedoms (Catholic Services, Bible Studies, etc.) from March 15, 2020 thru February 27, 2021.

**GRIEVANCE ISSUES – NEGLIGENCE, NEGLIGENT HIRING TRAINING, DIRECTION, RETENTION AND SUPERVISION, GROSS NEGLIGENCE, FRAUD, EQUAL PROTECTION OF THE LAWS**

84)  The facts for the grievance issues are mentioned throughout the facts of the entire complaint.

85)  Plaintiff has had his grievances, appeals to the Superintendent, CORC appeal statements, thrown out, lost, misplaced, delayed, denied, dismissed, replied to, etc…by the IGP or IGP staff.

86)  Defendant Quick, replies to mostly all of Plaintiffs grievances when she is not a direct party in violation of Directive #4040 §701.2(i); 7 N.YC.R.R. §701.2(i)) thereby violating constitutional rights and Code of Ethics (Directive #4040; 7 N.Y.C.R.R. §701.11(a-d, f-i)). 7 N.Y.C.R.R. §701.2(i) states, an individual so uniquely affected by the grievance that fair play dictates that he/she should be afforded an opportunity to provide input prior to any decision and also to appeal any disposition rendered. In harassment allegations, the employee who allegedly committed the misconduct is a direct party.

87)  Defendant Quick has a history of abuse and misconduct with the grievance process that has been brought forth by Plaintiff and previous ILC reps. (Sheldon Harris) to Defendant Capra, in addition to grievances by similarly situated/affected incarcerated individuals, etc… Additionally, Defendant Quick has had these similar issues in the past within these proceedings:

- Jenkins v. Cordero, 2019 WL 212165 (17 Civ. 1592) (JCM)
  Quick states grievances not received and time to file them has passed.
  I/I Warren recanted his statement that he had never seen the grievances because he was afraid of being fired from the grievance office if he admitted that he saw the grievance. Warren also testified that Quick tampered with grievances and prevented certain grievances from being filed.
  I/I Hale also recalled seeing a grievance concerning an assault that took place on the visit floor with C.O. Cordero).
- Ortiz v. Annucci, 2019 WL 1438006 (17-CV-3620) (RJS)
  Plaintiff claimed that his grievance was thrown out, discarded or in some other way destroyed.
- Jackson v. Jackson, 2021 WL 981849 (16-CV-08516) (PMH)
  Quick has no record of Plaintiff taking the final step of appealing the Superintendent decision to CORC.
- McRae v. Cordero, 2018 WL 3611964 (15-CV-4334) (NSR)(PED)
  Quick specifies there is no record of his grievance.
- Davis v. Grant, 2019 WL 498277 (15-CV-5359) (KMK)
  No record of CORC appeal
- Warren v. Quick, 2020 WL 7647220 (19-CV-10989) (VB)
  Plaintiff states that Quick informed him if he can take care of getting a grievant to sign off on his grievance by any means, you can be HB5 rep. Plaintiff filed a grievance regarding this matter but it was never filed. 2 or 3 days later, after submitting the grievance, he was fired as IGP clerk by Quick and demoted to a porter. Plaintiff file a complaint to Mallozzi (IGP Director) and Loren (IGP Coordinator) and each failed to remedy the violations. Plaintiff alleges that Mallozzi and Loren permitted Quick to do as she pleases with IGP.

88)  What is suspicious of all these grievance issues mentioned in the cases above is that the grievances/appeals were never received but the letters as to the status of the grievances were.

**RETALIATION, SLANDER, RETALIATORY TRANSFER, CONSPIRACY, NEGLIGENCE, NEGLIGENT HIRING TRAINING, DIRECTION, RETENTION AND SUPERVISION, GROSS NEGLIGENCE, FRAUD, EQUAL PROTECTION OF THE LAWS, FAIL TO INTERVENE**

89) Defendants and others retaliated and/or conspired against Plaintiff for exercising his constitutional rights/protected conduct as ILC and prison official's/defendant's conduct were in retaliation for such protected conduct.

90) On or about December 2021 and January 2022, Plaintiff was screened and approved for his name to be placed on the ILC ballot. Thereafter, Plaintiff was voted in and elected as HB7 ILC Representative. The Incarcerated Liaison Committee is governed by Departmental Directive #4002. Plaintiff was elected by his ILC peers as Chairman.

91) During ILC meetings, Defendant Capra would always state [in sum and substance and at times verbatim], "If you don't like it sue me, I'll see you in Court". This can be corroborated by practically every ILC rep that was present during these ILC meetings. Such as, Sheldon Harris, Michael Jones, S. Johnson, J. Wilson, etc...

92) On or about February 1, 2022, Plaintiff (ILC Chairman) filed an ILC agenda to the ILC Staff Advisor.

93) On or about March 1, 2022, Plaintiff (ILC Chairman) filed an ILC agenda to the ILC Staff Advisor. The ILC Agenda was denied almost entirely due to Defendant Capra being upset that staff misconduct was brought up in the ILC Agenda. None of the ILC reps were allowed to speak during the entire ILC Agenda meeting while Defendant Capra summarily denied all issues. ILC Reps J. Wilson and Plaintiff attempted to speak however, Defendant Capra stated, "I don't want to hear nothing"!

Defendant Capra interrupted, hindered and impeded by force and intimidation the Plaintiff & ILC Reps rights as an ILC body in the presence of the Executive Team whom either conspired and/or failed to intervene Defendant Capra's misconduct during this meeting. Defendant Velez was present for this meeting. (See attachment of March ILC Agenda & meeting minutes).

Plaintiff, compared to others similarly situated (incarcerated individuals that were ILC at the time Plaintiff was ILC) was selectively treated (denied to speak at the ILC meetings and denied to bring forth issues of staff misconduct); the selective treatment was based on impermissible considerations (due to Plaintiff filing ILC agendas explaining staff misconduct); intent to inhibit or punish the exercise of constitutional rights (protected activities as a member of the ILC).

94) On or about March 2 and 3, 2022, the floor plan of the law library was changed. Upon information and belief, the floor plan was changed in violation of Directive #4483(II)(A). Specifically, the floor plan was changed without the knowledge of or authorization of the Law Library Coordinator (C.F. Leone). The floor plan now violated the privacy of incarcerated individuals being assisted and the safety of clerks.

95) On or about March 8, 2022, Plaintiff filed an Article 78 proceeding (*Arriaga v. Quick, et al.*, Albany County Index No. 1753-22), challenging the package room process, grievance process and denial of footwear.

96) On or about March 16, 2022, Dennys Acevedo (08-A-6528) and Ricardo Cepeda (12-A-1366) filed grievances (Grievance #309-22) regarding them not being able to receive legal assistance while being housed in the infirmary because Elaine Velez (Law Library Administrator/ADSP) terminated the Law Library Facility Passes. Their grievance specifically stated: I have been requesting to see a law library clerk because I cannot get to the law library. I was informed by the infirmary OIC that law library clerk facility passes were terminated and not being renewed by direction of E. Velez (ADSP). I would like to receive my constitutional right to legal assistance pursuant to Directive #4483(II)(C)(3),(III)(E), (III)(F)(3) and P&P #337(G), (V)(A)(7) and (V)(H)(I), etc.

Action Requested: A clerk sent to me in the infirmary immediately so I can discuss my personal, sensitive and confidential legal issues. Law Library clerk facility passes to be reinstated immediately so as to not deny my constitutional right and violate Directive #4483.

During the IGRC hearing for grievance #309-22 an investigation report authored by Defendant Quick stated that the grievance was a ploy between Plaintiff, Acevedo and Cepeda so that Plaintiff can get his facility pass, exchange contraband and have unnecessary conversation. The IGRC was surprised to hear Plaintiff's name and the false allegations made when the report was read out loud since Plaintiff was not a direct party to the grievance.

The IGRC agreed in favor of Acevedo and Cepeda.

Upon information and belief, Acevedo and Cepeda appealed to the Superintendent.

97) Plaintiff alleges that Defendant Quick authored an investigation report to a grievance #309-22 inserting Plaintiff; which he was not part of specifying that (in sum and substance) that the grievances filed by these men were a ploy by Plaintiff to get a facility pass and for us to exchange contraband and have unnecessary conversation. The false allegations/statement by Defendant Quick also constitutes slander *per se* and fraud alleging the Plaintiff with serious crimes (i.e. P.L. §§205.00(3) and (4), 205.25) and prison rule violations (i.e. Rules 113.10 and 114.10) and/or tend to injure the Plaintiff in his trade, business or profession (law library clerk/paralegal, ILC Chairman, LUO President, CCEF Chairman).

98) On or about April 1, 2022, Plaintiff filed an ILC agenda to the ILC Staff Advisor.

Plaintiff (ILC Chairman) was not allowed to attend the ILC agenda meeting for April 2022. Plaintiff was never given a reason as to why he was not being allowed to attend. This can be corroborated by other ILC Reps.

99) On or about April 7, 2022, Plaintiff (Latinos Unidos Organization – President) filed 5 purchase orders for office supplies to Elaine Velez (ADSP). On April 21, 2022, E. Velez denied all purchase orders specifying "security" and "use what you have in your office".

On April 21, 2022, Plaintiff filed an appeal to the denial of 4 purchase orders to M. Capra (Superintendent). The appeal specifies: On April 21, 2022, the LUO was denied 5 purchase orders for office supplies by E. Velez (ADSP). I am writing to respectfully appeal the denials of each respective purchase order.

100) On Friday – April 15, 2022, while Plaintiff was participating in the Family Reunion Program, an ILC meeting was supposed to be held. However, while the other ILC representatives were seated and waiting for the executive team to arrive, E. Velez (ADSP) and upon information and belief (Defendant Thorpe) came into the conference room and stated that the meeting was cancelled because the Superintendent doesn't like the way the agenda was written and that if the next one is like this one "he would snatch souls". Additionally, Plaintiff was told by J. Wilson (07-A-1282) that staff informed him that the Superintendent has other plans for Plaintiff. Specifically, "getting me (Plaintiff) out of the jail. In which Plaintiff firmly believed to be transferred or going to be framed for some act he did not commit (false misbehavior report). These facts are supported by the grievances filed by the other ILC representatives: J. Wilson (07-A-1282), S. Salley (02-A-4875), D. Hall (14-A-5057), S. Johnson (99-A-3011) and M. Jones (90-A-5292).

101) On or about April 18, 2022, Defendant Capra authored a letter stating that Plaintiff was being removed as the President of LUO and Coordinator of CCEF due to Directive #4760(III)(A)(4). Plaintiff asserts this is retaliation for bringing forth matters of staff misconduct in the March and April 2022 ILC agendas and other issues. In the past, Plaintiff has been part of the LUO, CCEF and ILC Executive Boards (simultaneously) in the past at Sing Sing C.F. under the supervision of Defendant Capra without ever being removed. Additionally, other I/I's have been part of numerous executive boards for numerous inmate organizations without being removed (i.e. Jon-Adrian Velasquez, J. Wilson (07-A-1282 [at present time when Plaintiff was removed], et al.)

102) On April 20, 2022, after the ILC met up in the ILC office, the ILC decided to file an amended agenda because the Superintendent informed the ILC that he would not hold an ILC meeting with the issues of staff misconduct on the agenda. Plaintiff (ILC Chairman) and M. Jones (90-A-5292) (ILC Secretary), filed the amended agenda with only one issue, specifying, Issue #1 Communication between the

administration and the ILC. ILC suggestion: open to discussion. (See attachment of April 20, 2022, ILC Agenda).

103) On April 23, 2022, Eddie Gibbs came to interview M. Jones (90-A-5292) (ILC Secretary) at his cell due to the letters he received about the issues happening at Sing Sing C.F. due to staff misconduct amongst other things.

104) Due to Eddie Gibbs coming to Sing Sing C.F. to speak to M. Jones, on April 26, 2022, the ILC agenda meeting was held. Plaintiff (ILC Chairman) S. Johnson (HBA ILC Rep. and M. Jones (ILC Secretary) were not allowed to attend and sent back to our cells. Additionally, during this meeting Defendant Capra removed Issue #8 due to violation of ILC By Laws but fails to specify or identify which by law(s) are violated. Upon information and belief, M. Capra informed the other attending ILC reps that we could not attend because we were under investigation. However, none of us were ever notified regarding the alleged investigation. The ILC activities and duties are protected conduct by the First and Fourteenth amendment's right of petition. This was retaliation for bringing forth facts of staff misconduct in the ILC agendas filed. The issues surrounding the staff misconduct was never replied to properly in the ILC agenda minutes; not allowed to be discussed during the ILC agenda meeting per the direction of Defendant Capra at the ILC meeting to the other ILC reps. Every time the ILC brought forth staff misconduct Defendant Capra would not want to listen or discuss the matter including alleging that these matters were of a personal nature even though none of the ILC had any personal issues with the staff mentioned; these were issues relayed to ILC reps by general population.

Again, Defendant Capra interrupted, hindered and impeded by force and intimidation the Plaintiff & ILC Reps rights as an ILC body in the presence of the Executive Team whom conspired and failed to intervene due to Defendant Capra's misconduct during this meeting by not allowing the Plaintiff and other ILC reps to attend the meeting. Defendant Velez was present for this meeting. (See attachment of April ILC Agenda meeting minutes).

105) There is no directive, rule, regulation or by-law of ILC that states the names of specific correctional staff that are committing misconduct towards general population cannot be inserted in an ILC agenda. However, Defendant Capra always specifies and enforces this false rule.

106) On April 27, 2022, Plaintiff spoke to Sgt. Richardson (ILC Staff Advisor) inquiring why several ILC members including Plaintiff was not being called to attend this mornings meeting and sent back from the previous ILC meetings. Sgt. Richardson replied that she doesn't know why either or what's going on. Plaintiff handed over a drafted resignation letter as ILC Chairman/HB7 (Earned Housing Unit) ILC representative to Sgt. Richardson along with his facility pass.

107) Due to the intentional and malicious slander, false allegations of the investigation report authored by Defendant Quick to Grievance #309-22 on April 12, 2022, Plaintiff filed a grievance (#457-22) and a formal complaint against Defendant Quick to Shelley Mallozzi (Inmate Grievance Program Director; the formal complaint was never replied to by Mallozzi. Upon information and belief, Rachel Seguin is currently the new IGP Director.

108) On or about May 23, 2022, Defendant Velez authored a letter stating that Plaintiff is no longer the President of LUO due to the position Plaintiff holds as ILC President. Plaintiff asserts that this is retaliation for bringing up matters of staff misconduct in the March and April 2022 ILC Agenda.

109) On or about May 31, 2022, Plaintiff received the IGRC response to grievance #457-22 and filed an appeal to the Superintendent. The IGRC response stated, "although the grievance response is lengthy it fails to address the main concern of this grievance (i.e. How/why grievant's name became associated with an investigation response in which the grievance SS-0309-22 is unrelated to the grievant". Plaintiff asserts that Defendant Quick replied to this matter unprofessionally in violation of the Code of Ethics and violates Plaintiff's right to see

110) On or about June 20, 2022, Plaintiff received the Superintendent response for grievance #457-22 and Plaintiff appealed to the Central Office Review Committee.

111) Upon information and belief, it is rumored through grievance reps and clerks that worked in the IGRC Office in the past that Defendant Quick is the person that authors and forges the Superintendent signature and responses for mostly all of the grievances. Plaintiff believes Defendant Quick did the same for this grievance and mostly every other grievance.

112) Defendant Quick also intentionally and maliciously or wrongly assigns grievances the wrong code #'s so as to not alert Central Office staff of excessive complaints of a specific nature, most notably when a Code 49 is warranted. Defendant Quick did the same for Plaintiff's grievances and to others that were similarly situated/affected.

113) On Thursday - July 14, 2022, while Plaintiff was incarcerated at Sing Sing C.F. (Earned Housing Unit formerly known as Honor Block) was given draft bags and informed that he was to pack up all of his property because he was on the draft and being transferred to another facility. Plaintiff never requested for or was notified about any transfer prior to this notification.

114) On Thursday - July 14, 2022, Plaintiff handed over a grievance to the IGRC Clerk (A. Pegues) during the pm module regarding the transfer being retaliatory, amongst other things.

115) On or about July 17, 2022, Plaintiff was retaliatory transferred from Sing Sing C.F. to Green Haven C.F. (transit unit). On or about July 18, 2022, Plaintiff was retaliatory transferred from Green Haven C.F. (transit unit) to Sullivan C.F.

116) Classification Transfer referrals are through one or two possible methods: (1) some of the inmate transfers are scheduled at the facility due to a change in security, or due to an inmate's preference; (2) some of the inmate transfers are unscheduled transfer reviews from facilities for other reasons, including medical or mental health reasons. However, before the classification analyst in the Office of Classification and Movement receives a transfer referral from a DOCCS facility, three DOCCS employees – the Offender Rehabilitation Counselor (ORC), Supervising Offender Rehabilitation Coordinator (SORC) and the Deputy Superintendent for Programs working at the facility – ordinarily must approve the transfer referral (quoting, *Keyes v. Venettozzi*, 2022 WL 991402 *3). Based upon Plaintiff's transfer order/referral, it is obvious that the transfer was not ordinary as the highest supervisorial authority at Sing Sing C.F. filed the transfer order/referral.

117) Prior to Plaintiff being transferred, Defendants Capra, Velez and Thorpe filed false records/allegations conspiring against Plaintiff in a document called the transfer referral and thereafter approving the transfer referral in the transfer order document based upon false records and facts without anyone investigating such facts specified in the transfer referral/request or interviewing Plaintiff regarding the facts specified in the transfer referral/request. Plaintiff received the names of the defendants that transferred him in a letter sent to him on July 7, 2023, by Dian Kerr McCullough which was also sent to Hon. Briccetti presiding over this matter.

118) Plaintiff filed a FOIL request (FOIL Log No.CO-22-08-106) for the transfer order document which was dated June 3, 2022, and it falsely specified explanation for transfer, "Arriaga 06A0542 has been in Sing Sing since 7/8/2011. Arriaga is overfamiliar with facility and staff. I/I uses overfamiliarity to manipulate other, more vulnerable I/I's. Arrived in hub via area preference transfer".
Plaintiff has had a perfect disciplinary history for approximately 11 years at Sing Sing C.F. and has never been accused of or under investigation for the aforementioned false allegations. Additionally, Plaintiff is attaching a copy of the transfer order which was received via the FOIL request.

119) This transfer was in retaliation for Plaintiff (ILC Chairman) bringing forth the following (not limited to, but including) issues during his term as ILC Chairman of:
- staff misconduct brought forth by Plaintiff in the March and April 2022 ILC agendas which were never properly replied to or investigated by Defendants Capra and Velez or by the Sing Sing C.F. Executive Team.
- Plaintiff (ILC Chairman) bringing forth the issues surrounding Defendant Quick's abuse of the grievance process to Defendants Quick and Capra.

- Plaintiff (ILC Chairman), requesting Defendant Capra that the audio and video recording equipment that are in the legal booth visit area be removed due to privileged and confidential communications between client and lawyers, etc.
- Plaintiff (ILC Chairman), M. Jones, and J. Wilson bringing forth the issues of the Family Reunion Program to Defendant Capra and Ms. Agudelo (FRP ORC) that the FRP funds ($7,000.00 budget per year) for over 10 years have not been completely utilized for the FRP and been transferred to other areas/accounts which is why the FRP sites are in horrible condition. Plaintiff also filed grievance #754-22 regarding this matter.
- Plaintiff (ILC Chairman) and M. Jones brought forth the issue of medical staff stating that double mattresses will no longer be allowed for population to Defendants Capra and Velez.
- Plaintiff (ILC Chairman), bringing forth that Defendant Velez unlawfully terminated the law library clerks facility passes in violation of HALT Law, legal assistance duties of investigating facts and to interview witnesses, inability of incarcerated individuals that cannot access the law library, those who have court deadlines, etc...
- Plaintiff (ILC Chairman) bringing forth that Defendant Velez (Law Library Administrator/DSP) does not update the law library with newly implemented HALT law, COVID protocols, and CDC guidelines for prisons.
- Plaintiff (ILC Chairman and as CCEF Chairman and Co-Chairman) and Jon-Adrian Velasquez (former CCEF Chairman) brought forth that approximately $2,900.00 from the Creative Correction Education Foundation account has been taken from the account and that no one was responding to the inquiries being made to rectify or provide answers to this matter.
- Plaintiff (ILC Chairman) brought forth to Defendant Capra that the package room was going outside the scope of Directive #4911 by going online just to find a price above the limit to deny the item instead of attempting to corroborate with the place of purchase receipt.
- Plaintiff requesting for Defendant Capra to issue a commendable behavior report on his behalf for all the positive work he has done throughout the years and volunteered for including being part of the COVID Response Team; requesting commendable behavior reports for the COVID Response Team and to issue a memo that staff can file commendable behavior reports pursuant to Directive #4006(I) and (B) because when Plaintiff and other incarcerated individuals ask staff for a commendable behavior report they fear filing these reports which is contrary to the Directive.
- Plaintiff filing of grievance #457-22 against Defendant Quick which the transfer order suspiciously specified "manipulate/manipulative" which was the term utilized in Defendant Quick's investigation report to grievance #457-22.

120) On or about July/August, 2022, Plaintiff was mailed back the grievance he filed on Thursday - July 14, 2022 at Sing Sing C.F. On August 4, 2022, Plaintiff had to refile the grievance by mailing it to the IGP Supervisor (C. Proscia) at Sullivan C.F.

121) On or about August 11, 2022, IGP Supervisor (C. Proscia) sent Plaintiff a letter regarding the timeliness of his grievance must be submitted within 21 calendar days of the alleged occurrence. However, Plaintiff may submit mitigating circumstances which may extend the time limit to 45 days. On August 12, 2022, Plaintiff submitted the mitigating circumstances and the grievance was issued #0325/22. On August 22, 2022, the IGRC rendered a determination that this matter should be reviewed by the Superintendent for further remedy. Plaintiff agreed with the IGRC response and filed an appeal to the Superintendent on August 24, 2022.

122) On September 22, 2022, Plaintiff still did not receive a reply from the Superintendent to grievance #0325/22 and he filed a CORC appeal to the IGP Supervisor (C. Proscia) based upon a constructive denial.

123) On or about December 17, 2022, Plaintiff finally received a Superintendent response and filed a second CORC appeal for grievance #0325/22. Upon information and belief, the CORC appeal was sent by the IGP to CORC on or about December 28, 2022 and CORC received it on December 30, 2023.

124) Plaintiff has exhausted his administrative remedies via the grievance process for grievance #0325/22 since CORC has not replied within 30 days and attempted to inquire as to the status of the grievance to the IGP Supervisor. The IGP Supervisor advised Plaintiff that when he receives a reply from CORC it will be forwarded to him.

125) Upon information and belief, Defendant Annucci never intervened after reviewing the ILC agendas that affected Sing Sing C.F. population because he allowed the serious and severe matters of staff misconduct to go on without further investigation, inquiry or sending OSI investigators to interview the ILC and I/I's that have complaints against staff and Defendant Quick.

126) The retaliatory transfer caused Plaintiff's family (mother and wife) an undue hardship and burden as the cost for visiting and participating in the Family Reunion Program costs Plaintiff's family an additional approx. $370 for travel expenses per person for each FRP participated in and $70 per person for every visit.

**While Plaintiff was confined at Sullivan C.F.:**

127) On or about October 4-15, 2022, Plaintiff's housing unit (A-South) was placed on quarantine for COVID-19 (23-hour lock down).

128) On October 6, 2022, Plaintiff was randomly tested for COVID-19.

129) On October 7, 2022, Plaintiff came out positive for COVID-19 (for the fourth time) and sent to the infirmary from October 7-11, 2022, to a 4-man room (24-hour lockdown) with absolutely nothing to do in this room except look at the walls. There was no TV's in the room, denied: indoor and outdoor recreation, possession of non-cooking food (tea, soup, cough drops, oatmeal, coffee, tuna, etc.), hot pot/hot water, purchasing commissary, razor to shave, correspondence with family and lawyers, stationary supplies, personal access to the kiosk, law library tablet, violation of Patient Bill of Rights (10 N.Y.C.R.R. §405.7(c)(3), (8-9), and (14), etc... the Infirmary P&P or FOM #5010, updated COVID protocols and updated CDC Guidelines for Prisons.
On or about October 10, 2022, Plaintiff filed grievance #0444-22 (sometimes labeled #0443-22 in some documents) regarding this matter. The grievance was consolidated with numerous other individuals. The IGRC agreed with Plaintiff and other incarcerated individuals which were similarly situated/affected that grieved the same conditions.

130) Defendant Annucci and Sullivan C.F. medical staff: Mrs. Paige-Cannonier (Nurse Administrator) and J. Krom (Deputy Superintendent for Administration), while acting under color of law allowed for these violations to continue to occur.

131) Men housed in the SHU are afforded way more privileges than Plaintiff being confined to this room 24 hours a day; thereby penalizing me for being sick. In all other facilities where Plaintiff was housed, he would be allowed to have all the aforementioned property and privileges while being quarantined in the infirmary and in the unit.

132) Additionally, there was no observation being done while being quarantined in the infirmary and A-North, at best, our temperature would be checked twice a day. Plaintiff did not receive any observation or have his temperature checked or seen by anyone the weekend of October 15 – 17, 2022; which Plaintiff complained to the gallery officer about.

133) On October 11, 2022, Plaintiff was transferred out of the infirmary to A-North, 233 cell on lock down for 23 hours a day; with one hour to daily access the phone, shower and kiosk.

134) On October 2022 and November 2022 ILC Agenda, the ILC at Sullivan C.F. brought forth the matters regarding the conditions of confinement mentioned in this paragraph as the ILC Chairman was also quarantined during the same period as Plaintiff.

135) Plaintiff appealed grievance #0444-22 (also known as 443-22 in some documents) to CORC in December 2022.

136) Plaintiff has exhausted his administrative remedies via the grievance process for grievance #0444-22 (also known as 0443-22 in some documents) since CORC has not replied within 30 days and attempted to inquire as to the status of the grievance to the IGP Supervisor. The IGP Supervisor advised Plaintiff that when he receives a reply from CORC it will be forwarded to him.

137) On June 7, 2023, Plaintiff had a quarterly interview with C. Iral (ORC). During the interview, Plaintiff inquired as to who would have the information pertaining to his transfer from Sing Sing C.F. to Sullivan C.F. C. Iral (ORC) specified that Movement & Classification in Central Office would have all the information and names of person pertaining to Plaintiffs transfer.

**Injuries**

If you sustained injuries related to the events alleged above, describe your injuries and state what medical treatment, if any, you required and did or did not receive.

Plaintiff did not receive any medical treatment while having COVID-19 even though he filed sick call slips. Plaintiff did not receive any medical care, observation services, treatment while being confined/quarantined in Sing Sing C.F. HB5-A-Gallery (Quarantine Unit for COVID-19) including the conditions of the unit were not up to any hospital or medical facility standards.

Plaintiff was denied a double mattress for his back pain even after discussed as a term in a prior settlement. *Arriaga v. Gage*, 16-CV-1628 (NSR).

Plaintiff has what is deemed "long COVID" due to his senses of taste and smell have not been completely regained. Plaintiff has not received any medical treatment for this.

## IV.    Relief

State briefly what money damages or other relief you want the Court to order.

**Injunctive Relief:**

- Immediately reassign or remove Defendant Quick as Inmate Grievance Supervisor until a complete investigation into the facts alleged in this civil rights complaint (code of ethics violations [Directive #4040; 7 N.Y.C.R.R. §701.11(a-d, f-i)); is completed and it's complete investigation, interviews of witnesses who filed grievances and made complaints about Defendant Quick's misconduct, the findings of the investigation, etc. are disclosed to Plaintiff, the NYS Attorney General and this Court;

- Immediately cease Defendant Quick from replying to grievances to which she is not a direct party.

- bring forth a mechanism at Sing Sing C.F. so that similarly situated incarcerated individuals at Sing Sing C.F. can have proof that they filed a timely grievance and/or appeal so that no more grievances or appeals are falsely denied as untimely or not received.

- Immediately cease the Sing Sing C.F. staff from: denying the ILC from bringing forth issues of specific staff members misconduct on ILC agendas and retaliating against ILC for bringing forth population issues.

- Immediately have NYSDOCCS assign positions in Central Office for a person to review all ILC agendas and minutes and a person to who the ILC can appeal denials of ILC issues.
- Immediate inspection of HB5-A-Gallery (COVID-19: Quarantine Unit)
- Immediately install double the amount of phones in every NYSDOCCS correctional facility at a distance of 6 feet apart and expedite the process of Wi-Fi capability for kiosk, phone and Westlaw use in all correctional facilities to prevent the contracting and spread of COVID-19 and any other communicable diseases.
- Immediately suspend and cease the 36 month – length of stay memorandum authored by Defendant Annucci towards all incarcerated individuals with law library program assignments until a determination of this proceeding is made so as to not deny incarcerated individuals their constitutional right to legal assistance, *Bounds* violation, interference with Writ of Habeas Corpus, etc.
- Immediately remove the audio and video recording devices from the visit room legal booths and erase and destroy all audio and video recordings
- Immediately install TV's in all the infirmary rooms at Sullivan C.F. and allow incarcerated individuals to have all privileges and recreation that was denied to them while they are quarantined for COVID-19.

**Damages:**
Plaintiff ($5,000,000.00),
any and all future costs related to medical care for "long COVID" *not limited to, but including* (treatments, procedures, surgeries, x-rays, CT scan, MRI's, transplants, rehabilitation, nursing care, emergency services, observation services, anesthesia, etc...),
costs of ambulatory services,
co-pay and costs of doctor appointments, follow-ups, visits,
co-pay and costs of specialist appointments, follow-ups, visits,
all prescriptions costs,
pain and suffering (past, present and future),
etc...

**Other Relief:**
**Reimburse** the CCEF account with the funds wrongfully removed (approximately $2,900.00) and/or send the funds to the facility where Plaintiff is being housed to start a CCEF special purpose organization.

Bring forth a mechanism at Sing Sing C.F. so that similarly situated incarcerated individuals at Sing Sing C.F. can have proof that they filed a timely grievance and/or appeal so that no more grievances or appeals are falsely denied as untimely or not received.

NYSDOCCS assign positions in Central Office for a person to review all ILC agendas and meeting minutes and a person to who the ILC can appeal denials of ILC issues.

Install double the amount of phones in every NYSDOCCS correctional facility at a distance of 6 feet apart and expedite the process of Wi-Fi capability for kiosk, phone and Westlaw use in all correctional facilities to prevent the contracting and spread of COVID-19 and any other communicable diseases.

Suspend and cease the 36 month – length of stay memorandum authored by Defendant Annucci towards all incarcerated individuals with law library program assignments until a determination of this proceeding is made so as to not deny incarcerated individuals their constitutional right to legal assistance, *Bounds* violation, interference with Writ of Habeas Corpus, etc.

Remove the audio and video recording equipment in the visit room legal booth visit in Sing Sing C.F.

Install TV's in all the infirmary rooms at Sullivan C.F. and allow incarcerated individuals to have all privileges and recreation that was denied to them while they are quarantined for COVID-19.

**Declaratory Relief**
- Proper procedure for the ILC meetings is to have all ILC members present.
- It is proper procedure for the ILC to be allowed to appeal ILC Agenda determinations rendered by facility staff to Central Office Staff
- It is improper to deter or ignore matters presented by the ILC to the Executive Team and Superintendent
- It is improper for the Deputy Commissioner's and Acting Commissioner in Central Office to ignore issues presented on ILC Agendas
- Law Library Clerks cannot be transferred or removed from their program assignment while pending litigation while assigned to an incarcerated individual
- Law Libraries are not security sensitive

V.    **Exhaustion of Administrative Remedies Administrative Procedures**

The Prison Litigation Reform Act ("PLRA"). 42 U.S.C. §1997(a), requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or other Federal law, by a prisoner confined in any jail, prison or other correctional facility until such administrative remedies as are available are exhausted."

Administrative remedies are also known as grievances procedures. Your case may be dismissed if you have not exhausted your administrative remedies.

A.    Did your claim(s) arise while you were confined in a jail, prison, or other correctional facility?

☑  Yes
☐  No

If yes, name the jail, prison, or other correctional facility where you were confined at the time of the events giving rise to your claim(s).
Sing Sing Correctional Facility – 354 Hunter Street – Ossining, New York 10562
Sullivan C.F. – 325 Riverside Drive – Fallsburg, New York 12733

B.    Does the jail, prison, or other correctional facility where your claim(s) arose have a grievance procedure?

☑  Yes

☐    No

☐    Do not know

C.    Does the grievance procedure at the jail, prison, or other correctional facility were your claim(s) arose cover some or all of your claims?

☑    Yes

☐    No

☐    Do not know

If yes, which claim(s)? All of them

D.    Did you file a grievance in the jail, prison, or other correctional facility where your claim(s) arose concerning the facts relating to this complaint?

☑    Yes

☐    No

☐    Do not know

If no, did you file a grievance about the events described in this complaint at any other jail, prison, or other correctional facility?

☐    Yes

☐    No

E.    If you did file a grievance:

1.    Where did you file the grievance? At Sing Sing C.F. and Sullivan C.F.

2.    What did you claim in your grievance? See Facts of the Complaint and grievance packets which will be supplied thru discovery

3.    What was the result, if any? All grievances were denied, constructive denial/not available.

4.    What steps, if any, did you take to appeal that decision? Is the grievance process completed? If not, explain why not. *(Describe all efforts to appeal to the highest level of the grievance process.)*
Plaintiff appealed all grievances to the Superintendent and then to Central Office Review Committee.
Plaintiff also sent follow-up letters to the IGP Supervisors and CORC.

If you did not file a grievance:

1.   If there are any reasons why you did not file a grievance, state them here:

   _____

2.   If you did not file a grievance but you did inform officials of your claim, state who you informed, when and how, and their responses, if any:

   _____

F.   Please set forth any additional information that is relevant to the exhaustion of your administrative remedies.
   - Plaintiff while working as an ILC Representative and other ILC Representative (Sheldon Harris) at Sing Sing C.F. complained of Quandera T. Quick's misconduct and code of ethics violations in ILC Agendas and Executive Team agenda meetings. Specifically, that she would not file grievances, lose grievances, and delay the filing of grievances and appeals deeming them untimely, replying to grievances when she is not a direct party, amongst other things.

   *(Note: You may attach as exhibits to this complaint any documents related to the exhaustion of your administrative remedies.)*

## VI.   Previous Lawsuits

The "three strikes rule" bars a prisoner from bringing a civil action or an appeal in federal court without paying the filing if that prisoner has "on three or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it was frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury." 28 U.S.C. § 1915(g).

To the best of your knowledge, have you had a case dismissed based on this "three strikes rule"?

☐   Yes

☑   No

If yes, state which court dismissed your case, when this occurred, and attach a copy of the order if possible.

   _____

A.   Have you filed other lawsuits in state or federal court dealing with the same facts involved in this action?

   ☐   Yes

☑    No

B.    If your answer to A is yes, describe each lawsuit by answering questions 1 through 7 below. *(If there is more than one lawsuit, describe the additional lawsuits on another page, using the same format.)*

    1.    Parties to the previous lawsuit
       Plaintiff:
       Defendant:

    2.    Court *(if federal court, name the district; if state court, name the county and state)*

       _____

    3.    Docket or index number

       _____

    4.    Name or judge assigned to your case

       _____

    5.    Approximate date of filing lawsuit

       _____

    6.    Is the case still pending?

       ☐    Yes
       ☐    No

       If no, give the approximate date of disposition.

       _____

    7.    What was the result of the case? (For example: Was the case dismissed? Was judgment entered in your favor? Was the case appealed?)

       _____

C.    Have you field other lawsuits in state or federal court otherwise relating to the conditions of your imprisonment?
    ☑    Yes
    ☐    No

D.    If your answer to C is yes, describe each lawsuit by answering questions 1 through 7 below. *(If there is more than one lawsuit, describe the additional lawsuits on another page, using the same format.)*

1. **Parties to the previous lawsuit #1**

   Plaintiff: Anthony Arriaga
   Defendant: Joana Otaiza

2. Court *(if federal court, name the district; if state court, name the county and state)*
   Southern District for New York

3. Docket or index number
   20-CV-06992

4. Name or judge assigned to your case
   Philip M. Halpern

5. Approximate date of filing lawsuit
   August 26, 2020

6. Is the case still pending?

   ☐  Yes
   ☑  No

   If no, give the approximate date of disposition. November 19, 2021

7. What was the result of the case? *(For example: Was the case dismissed? Was judgment entered in your favor? Was the case appealed?)*
   Dismissed

1. **Parties to the previous lawsuit #2**

   Plaintiff: Anthony Arriaga
   Defendants Dr. Dana Gage, et al.

2. Court *(if federal court, name the district; if state court, name the county and state)*
   Southern District for New York

3. Docket or index number
   16-CV-1628

4. Name or judge assigned to your case
   Nelson S. Román

5. Approximate date of filing lawsuit
   March 3, 2016

6. Is the case still pending?

   ☐  Yes

☑    No

If no, give the approximate date of disposition. unknowm

7.    What was the result of the case? *(For example: Was the case dismissed? Was judgment entered in your favor? Was the case appealed?)*
Settlement

1.    **Parties to the previous lawsuit #3**

Plaintiff: Anthony Arriaga
Defendant: City of New York

2.    Court *(if federal court, name the district; if state court, name the county and state)*
Southern District for New York

3.    Docket or index number
06-Civ-2362

4.    Name or judge assigned to your case
P. Kevin Castel

5.    Approximate date of filing lawsuit
unknown

6.    Is the case still pending?

☐    Yes
☑    No

If no, give the approximate date of disposition. May 20, 2008

7.    What was the result of the case? *(For example: Was the case dismissed? Was judgment entered in your favor? Was the case appealed?)*
Summary judgment in favor of defendants

## VII.    **Certification and Closing**

Under Federal Rules of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law by a non-frivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

**A.    For Parties Without an Attorney**

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:          July 27, 2023

Signature of Plaintiff
Printed Name of Plaintiff   Anthony Arriaga
Prison Identification #      06-A-0542
Prison Address              Sullivan C.F. – 325 Riverside Drive – Fallsburg, New York 12733

**B.    For Attorneys**

Date of signing:

Signature of Attorney
Printed Name of Attorney
Bar Number
Name of Law Firm
Prison Address

|  | City | State | Zip Code |
|---|---|---|---|

Telephone Number
E-mail Address

STATE OF NEW YORK
DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION
SING SING CORRECTIONAL FACILITY
INCARCERATED LIAISON COMMITTEE

Staff Advisor: Sgt. C. Giribaldi
Chairperson: Anthony Arriaga
Secretary: Michael Jones

To: Michael Capra, Superintendent
Fr: Incarcerated Individual Liaison Committee
Dt: ILC Agenda - March 2022
Re: March 2, 2022

Pursuant to Directive #4002, which deems the Inmate Liaison Committee legislative in function, the following constitutes the issues brought forth to this administration for legislation, clarification or resolution.

## ISSUE #1: FEMALE STAFF ARE ACTING UNPROFESSIONALLY

Population have been on the receiving end of very unprofessional acts by female staff while other supervisors and co-workers stand by without correcting or resolving the unprofessional behavior; which clearly violates numerous sections of the NYSDOCCS Employee Manual. The specific issues complained of are not limited to, but including: specific female staff, inappropriate and unprofessional communications, cursing, screaming, racial slurs, negative attitude/demeanor, ignoring an I/I in need, hanging out, leaving their post to hang out in other areas without properly being relieved and not signing in their presence in that area in the appropriate logbook, etc…

### SUGGESTION/RESOLUTION REQUESTED:

Female staff should be reminded that their job duty is under color of law and to act in a professional manner that does not jeopardize the safety and security of the facility and violates the employee manual. Fellow co-workers and supervisors should immediately intervene when they observe female staff act unprofessionally to deescalate or prevent any situation.

## ISSUE #2: WATER SAFETY & QUALITY (LEGIONNAIRE'S & H. PILORI)

Men in population are requesting for the water quality to be tested at the facility including requesting for an annual drinking water quality report for 2022 from the Village of Ossining Water System. tested yearly

### SUGGESTION/RESOLUTION REQUESTED:

A test to be conducted regarding the water quality by the appropriate agency and such report to be posted for population to review.

## ISSUE #3: MESS HALL CONDITIONS

The Mess hall is one of the few programs that ran continuously throughout the entire duration of the pandemic, non-stop, and they will have to continue working whether things get better or worse.

### A) Mess hall Showers

The showers in the Mess hall are located in the basement of the kitchen. There is a memo in the

Kitchen's OIC that states the basement where the showers are located does not have to be opened until 9am and can be closed at 10am. On a daily basis the Mess hall workers average 40+ men. It is impossible for the 40+ men to take a shower in one hour. For the most part, the basement is open from approx. 8:15-9:30 am (until count time) and from approx. 10-11:00 (after count time). However, the memo as it stands has given some Mess hall officers the discretion and means to abuse their power and in doing so deny a dozen or so 'essential workers' an opportunity to shower; which has already happened on a number of occasions and is a health and safety concern.

**B) Kiosk Access**

When a specific section of the gallery is scheduled for 'AM' kiosk use, most of those I/I are working in the Mess hall. The gallery officer has been given the discretion to allow them access to the kiosk when they return from work. Upon returning to the gallery, the gallery officer has the discretion to either deny or allow them the opportunity to use the kiosk. The Directive says that each I/I is allowed 15 minutes per day for kiosk use.

For the most part, the gallery officer affords the Mess hall workers kiosk access. However, this unwritten rule affords the officer the discretion and means to abuse their power and in doing so deny 'essential workers' the opportunity to their kiosk session and the means to communicate with family, friends and loved ones; which has already happened on a number of occasions.

**C) Recreation**

There is no 'recreation' area for Mess hall workers. Most, if not all, Mess halls through out the state have recreation areas (e.g. TV, pull-up, dip bar, etc.). The ILC was informed by Correctional staff that there was once a small outside area for kitchen workers to exercise, walk, smoke, or simply get some air. However, it was closed and no one seems to know why. Recently, the facility was forced to minimize recreation to only the am/pm modules (alternating between HBA & HBB), and because of this, kitchen workers were denied recreation for a number of days. On some days, specifically the 11th, 12th, 16th and 17th, the yard was ran in the am module only (back-to-back). Thus, denying am Mess hall workers any form of recreation.

**D) MESS HALL PANS & SHEET PANS SEEPING ALUMINUM RESIDUE**

The aluminum sheets pans and four inch pans are seeping metallic residue. The men who work in the Mess hall have informed the ILC that when they wipe down the pans with brown paper towels there is metallic residue remaining on the napkin. We have been told that the reason this metallic residue is seeping from the sheet pans is two fold:
- the solution they are required to use is not being provided;
- the water is not hot enough to properly cleanse the pans (after which they are rinsed in the solution)(the pans may be too old as well);

**E) Messhall seating**

The messhall seating has changed and there is no social distancing. Population has not received any notice and the visit room has not changed back to normal.

**SUGGESTION/RESOLUTION REQUESTED:**

A) A new memo be issued to reflect that the basement remain open from 6:30 am until 9:30am (count) and upon completion of the count until approx. 11:00 (commencement of chow). This affords men who have different job descriptions to take a shower when they have free time.

B) That a memo be issued to reflect that Mess hall workers be afforded the opportunity to use the kiosk upon return to their gallery on the days that they work and miss their scheduled kiosk session.

C) That a standardized one unit pull-up/dip/push up station be placed into the basement; or reopen the outside area previously closed and place a standardized one unit pull-up/dip/push up station in that area and place a TV into the 5 bldg. wall (supposedly, there was a TV stationed on the wall in 5 bldg. years ago); or into an outside area with the exercise equipment. The Mess hall workers are not asking for any special privileges, only that they be treated equally and afforded the same opportunities as general population. In the event of another 'shelter-in-place' or minimization of regularly scheduled programs they will be required to work and should not be denied showers, kiosk or recreation because they are providing a service in the form of programs to the facility and its administration.

D) That the sink be fixed to provide the necessary hot water (temperature) to ensure cleanliness; That the necessary solution be provided and/or that new pans (sheet pans) be ordered;

E) Notice should be provided to the population whenever changes occur to Covid conditions and the visit room seating arrangements should return to normal conditions as well.

## ISSUE #4: LAW LIBRARY

### A) Facility passes

Recently, the law library facility passes were not renewed based upon their being no more I/I's being confined. A letter was sent as a follow-up to address the matter but no response was received. The reasons for the law library passes to be reinstated are as follows:

- There are I/I's that may be confined (pursuant to Directive #4932 §251-1.6) or keep lock throughout the facility. The I/I's in HBA-L-50 [2/1/22], HBB-Z-4 and Z- 28 [2/12/22] were or are confined and are requesting to see law library clerks but cannot.

- The facility passes allow clerks to possess other I/I's legal documents after they are interviewed to be brought to and from the facility law library. Without these passes clerks are not allowed to possess or transport legal documents to and from the law library.

- Clerks that are assigned to I/I's that receive responses from the Court or other agencies require their assistant clerk to pick-up their legal documents to begin working on replies immediately because callouts to the law library take up to 2 weeks to process and because emergency access is being denied (callouts only).

- I/I's in the Infirmary and PSU that cannot come to the law library require clerks to assist them in investigating facts, interviewing witnesses, typing assignments, legal assistance, etc.

- I/I's that are illiterate, limited English proficiency (LEP), or are prohibited from visiting the law library require legal assistance. For instance, there are I/I's that are unable to even fill out a callout slip (See Directive #4483(III)(E) and (F)(2-3)).

- The passes are needed for clerks to conduct orientation in Tappan.

- Pursuant to NYSDOCCS Handbook for Administration of Correctional Facility Law Libraries §4.11 – Paralegal Assistants duty consists of "investigating facts". A paralegal cannot investigate facts or interview witnesses without these facility passes.

- Pursuant to NYSDOCCS Handbook for Administration of Correctional Facility Law Libraries §9.4(V)(C)(3)(a) – I/I's with deprivation orders that cannot access the law library require legal assistance upon request.

### B) Law Library porters need to be hired for the law library and a hand sanitizer station should be installed.

Currently, there are no law library porters on the payroll and no hand sanitizer station.

**C) The removal of furniture and change in floor plans and excessive searches of the law library are a confidentiality and security concern.**

Recently, the removal of furniture, changes in floor plans and excessive searches in the law library are violating the following:

- Puts a safety concern (foreseeable risk) to the clerks working in the law library as clerks cannot see (our backs are to the door) the I/I's attempting to enter the clerk areas;
- Violates the privacy and confidentiality entrusted to clerks when dealing with sensitive information (discussing: (1) personal & confidential facts of an I/I's case; (2) interviews with I/I's that are or were informants ("snitches"), sex offenders (rapists, pedophiles, etc.), etc…because other clerks and the I/I's they are assisting will be sitting right next to each other;
- Legal documents and transcripts are being complained of to be missing. Said documents are very expensive and some are priceless as they can never be retrieved by F.O.I.L. request or Judiciary Law §255 request.

**D) The law library requires a computer to be purchased and installed in an appropriate area so that court records (CD, DVD and USB thumb drive) received can be reviewed with their legal assistant in the law library.**

**SUGGESTION/RESOLUTION REQUESTED:**
A) Law Library facility passes be reinstated so as to not deny, deprive the aforementioned and any other applicable directives, laws or violate I/I's their constitutional rights of access to the courts and of legal assistance, etc…
B) Law Library Porters should be hired pursuant to Directive #4483(III)(F)(3) [see page 3 of 5] and a hand sanitizer station should be installed. I/I's that access the law library all utilize typewriters and thin client research computers which require cleaning, disinfecting and the utilization of hand sanitizer.
C) While being searched, all documents and material that are moved should be returned to it's original place.
D) Purchase a computer for the law library so that court records (CD, DVD and USB thumb drive) received by I/I's can be reviewed with their legal assistant in the law library.

**ISSUE #6: I/I'S HOUSED IN THE INFIRMARY ARE NOW BEING DENIED THE PHONE TABLETS AND INFORMED THAT ONLY I/I'S WITH THE STATUS OF IPC/PC/SHU AND COVID PATIENTS ARE ALLOWED TO UTILIZE THE PHONE TABLETS.**

**SUGGESTION/RESOLUTION REQUESTED:**
The phone tablets are supposed to be utilized by any I/I housed in the infirmary. There has been no documentation posted by Central Office limiting the phone app to specific I/I's housed in the infirmary.

**ISSUE #7: THE WALL SYSTEM (RADIO) ON THE BACK WALL OF EVERY CELL IN HBA IS NOT WORKING PROPERLY AND A NEW ONE NEEDS TO BE INSTALLED.**

**SUGGESTION/RESOLUTION REQUESTED:**
We are requesting that the same radio/satellite system installed into HBC for the SHU/IPC/PC be installed/upgraded into HBA for the population. Being looked @

## ISSUE #8: OUSTANDING PURCHASE ORDERS ARE UNFULFILLED OR ITEMS ARE WITHELD BY SECURITY STAFF FOR LONG PERIODS OF TIME

Either items have been received by the facility and withheld by security staff for long periods of time or the order has not been made by administrative staff for the following purchase orders for the FRP: IBF21013, OT21113, OT21125, and OT21131.

**SUGGESTION/RESOLUTION REQUESTED:**
ILC or Organizations should be notified when items have arrived and received items should be placed into the FRP in a timely manner.

### REVISITED ISSUES

## ISSUE #1: POPULATION IS REQUESTING FOR DOUBLE THE AMOUNT OF PHONES TO BE INSTALLED THROUGHOUT THE FACILITY. IN THE ILC AGENDAS OF APRIL, MAY, JULY AND NOVEMBER 2019, THE POPULATION HAD REQUESTED MORE PHONES AND MORE PHONES HAD BEEN APPROVED.

Prior to the pandemic, we were informed that construction was approved for the addition of phones.

**SUGGESTION/RESOLUTION REQUESTED:**
Population is requesting to know when the construction for the addition of phones will commence.

_____                                    _____
Anthony Arriaga                                            Michael Jones
ILC Chairman                                              ILC Secretary


_____
Sgt. C. Giribaldi
ILC Staff Advisor

 **Corrections and Community Supervision**

KATHY HOCHUL                          ANTHONY J. ANNUCCI
Governor

<u>INCARCERATED INDIVIDUAL LIAISON COMMITTEE MEETING MINUTES</u>
<u>March 2022</u>

**Present:**
M. Capra, Superintendent
J. Wood, FDS
A. Helms, DSA
M. Marchese, Steward
C. Nixon, Captain Acting DSS
E. Velez, ADSP
C Hill, ADSP PREA
L. Jackson-Smith  DSH
C. Giribaldi, IILC Staff
   Advisor

| | |
|---|---|
| Battle, N | #94A4242 |
| Chapman, T | #09A2676 |
| Arriaga, A | #06A0542 |
| Wilson, J | #07A8212 |
| Jones, M | #90A5292 |
| Hall, D | #14A5057 |
| Salley, S | #02A4785 |

*Superintendent Capra reviewed memo issued by*
**Anthony J. Annucci, Acting Commissioner**
HALT Law - Impact on Sanctions and Location of Confinement
Superintendent Capra reviewed
Directive #4002 Incarcerate Liaison Committee

**Superintendent Capra stated as a result of the poorly written and inappropriately conveyed IILC agenda, the response will be as follows:**
The role of the IILC is to represent and efficiently convey the desires, need for clarity, and request for possible positive changes as requested by the population as a whole.  There is absolutely no room for personal complaints or agendas.
History would reflect I support most if not all ideas or suggestions for positive programming, special events and community outreach initiatives, so I believe it is understood that this administration has been a great advocate to the incarcerated population of Sing Sing C.F. Most of your demands in this agenda have been denied. I did state that we could revisit population issues during the April's IILC meeting providing the agenda is articulated and conveyed with respect and the appropriate decorum.

_____                    _____
Superintendent                                                                      Date

_____                    __3_/_21_/_22_____
ILC Member                                                                          Date
MC:mb
cc:    J. Collado, Acting Asst. Comm.                    ILC Chairman
       M. Damore, CIU Director                              Exec Team    ILC Sgt.

STATE OF NEW YORK
DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION
SING SING CORRECTIONAL FACILITY
INCARCERATED LIAISON COMMITTEE

Staff Advisor: Sgt. Richardson
Chairperson: Anthony Arriaga
Secretary: Michael Jones

To:  Michael Capra, Superintendent
Fr:  Incarcerated Liaison Committee
Dt:  ILC Agenda - April 2022
Re:  April 1, 2022

Pursuant to Directive #4002, which deems the Incarcerated Liaison Committee legislative in function, the following constitutes the issues brought forth to this administration for legislation, clarification or resolution.

The ILC notes that this agenda was prepared in a manner to effectively communicate systemic issues relayed to the ILC by the population in manner that is conducive to effective communication between us and local administration.

**ISSUE#1: THE ILC WOULD LIKE TO INCREASE CONSTRUCTIVE DIALOGUE BETWEEN THE ILC AND THE ADMINISTRATION AT EVERY LEVEL.**

**SUGGESTION/RESOLUTION REQUESTED:**
Open for discussion.

**ISSUE#2: PACKAGE ROOM STAFF CONTINUES TO DENY FOOTWEAR WHICH MEETS 4911 STANDARDS AND DOES NOT FURNISH I/I'S WITH A COPY OF THEIR RECIEPT/INVOICE.**

**SUGGESTION/RESOLUTION REQUESTED:**
The sales receipt and invoice should be deemed binding upon package room staff (in regards to price). Package room staff should always issue a copy of all receipts/invoices to I/I's when receiving their footwear and retain a copy in their package room folders for purposes of corroboration when under scrutiny.

**ISSUE#3: SEARCH TEAM ERRONEOUSLY CONFISCATES FOOTWEAR BASED ON OPINION OF PRICE AND WITHOUT INVESTIGATION.**

**SUGGESTION/RESOLUTION REQUESTED:**
The population requests for secur ity sta ff to call the package room before confiscation of footwear or any other property prior to confiscation.

**ISSUE #4: INCARCERATED INDIVIDUAL'S WOULD LIKE CLARITY ON THE LOSS OF RECREATION PRIVILEGES.**

**SUGGESTION/RESOLUTION REQUESTED:**
Open for discussion

**ISSUE #5: TELEVISION REPAIR, RESALE PROGRAM OR PACKAGE VARIANCE**
Televisions have not been sold in the commissary for months. We would like the administration to consider alternatives such as a television repair, resale program (of TV's that were confiscated) and or variance to allow population to purchase an approved television from a previously approved vendor.

**SUGGESTION/RESOLUTION REQUESTED:**
Open for discussion

**ISSUE#6: I/I ORGANIZATIONS - REQUEST TO PURCHASE OR BE PROVIDED THEIR OWN COMPUTERS FOR ORGANIZATIONAL USE**

**SUGGESTION/RESOLUTION REQUESTED:**
Open for discussion

**ISSUE#7: I/I ORGANIZATIONS - REQUEST AN INCREASE IN ALLOWABLE SPENDING FOR THE UPCOMING EVENTS IN MAY AND JUNE 2022.**

**SUGGESTION/RESOLUTION REQUESTED:**
Open for discussion

**ISSUE #8: THE POPULATION HAS EXPRESSED CYNICISM IN REPORTING STAFF MISCONDUCT VIA GRIEVANCE PROCESS AND SEEKS TO ADDRESS MISCONDUCT AROUND PARTICULAR INDIVIDUALS:**
The population has provided the ILC with a list of security staff, which is attached to this agenda, which they have deemed most problematic.

**SUGGESTION/RESOLUTION REQUESTED:**
The population requests alternative resolutions to resolve these issues informally.

**ISSUE #9: LAW LIBRARY - FACILITY PASSES**
Recently, the passes were terminated based upon I/I's no longer being confined.
This leaves population without the following [not limited to, but including]:
- A paralegal cannot investigate facts or interview witnesses without these facility passes. NYSDOCCS Handbook for Administration of Correctional Facility Law Libraries §4.11 – Paralegal Assistants duty consists of "investigating facts".
- allows clerks to transport and possess I/I's legal materials to and from the law library.
- allows clerks to go to I/I's cells that have received a recent response from an opposing party and begin a follow-up or reply; so as to not rush or be compelled to request an extension from the Court or opposing party.

**SUGGESTION/RESOLUTION REQUESTED:**
The population requests from the administration a solution to accommodate population.

**ISSUE #10: LAW LIBRARY - HAND SANITIZER**
Currently, there is no hand sanitizer station in the law library.

**SUGGESTION/RESOLUTION REQUESTED:**
The population requests a hand sanitizer station to be installed

## ISSUE #11: LAW LIBRARY - FLOOR PLANS

Due to the recent floor plan changes it puts a safety concern (foreseeable risk) to the clerks working in the law library as clerks cannot see (our backs are to the door) the I/I's attempting to enter the clerk areas;

There is no privacy and confidentiality when dealing with sensitive information (discussing: (1) personal & confidential facts of an I/I's case; (2) interviews with I/I's that are or were informants ("snitches"), sex offenders (rapists, pedophiles, etc.), etc...because other clerks and the I/I's they are assisting will be sitting right next to each other. **Also, I/I's are seriously concerned that opportunists will utilize this change to make false accusations to obtain a favor or some type of time reduction from administration or District Attorney's Offices.**

## SUGGESTION/RESOLUTION REQUESTED:

The population requests from the administration a solution to accommodate population b y securing safety, confidentiality and privacy.

## ISSUE #12: LAW LIBRARY - INCOMING CD'S/DVD'S/USB THUMBDRIVES

I/I's are receiving CD's/DVD's/USB thumbdrives from courts, district attorney's office's their attorney's and other agencies (due to modern technology). Some I/I's are illiterate, LEP and laymen at law. They would like to review the legal materials with their legal assistance in the law library.

## SUGGESTION/RESOLUTION REQUESTED:

The population requests from the administration a solution to accommodate population.

## ISSUE #13: INMATE VISITOR PROGRAM - NO INFORMATION OR INCORRECT INFORMATION, PARTICULARLY AGE, RELATIONSHIP, AND NAMES, HAVE BEEN PLACED ON VISITOR'S PASSES WHEN VPS IS DOWN.

Accurate visiting records are important as criterion for FRP and family event participation.

## SUGGESTION/RESOLUTION REQUESTED:

Open for discussion

## ISSUE #14: INMATE VISITOR PROGRAM - I/I POPULATION IS CONCERNED THAT THE VISIT ROOM CAPACITY AND INCREASES IN VISITATION MAY LEAD TO MORE SIGNIFICANT DELAYS AND FREQUENT TERMINATIONS.

## SUGGESTION/RESOLUTION REQUESTED:

According to the memorandum dated December 23, 2021 by Commissioner Annucci regarding modification of visitation criteria – Statewide, states, visiting rooms will operate at half capacity to facilitate social distancing. To ensure maximum and efficient utilization of the visit room, the present configuration should be revisited to allow 50% of the visit room's maximum capacity to be utilized.

## ISSUE #15: INMATE VISITOR PROGRAM - WHEN WILL OUTSIDE PAVILION REOPEN?

## SUGGESTION/RESOLUTION REQUESTED:

Open for discussion.

**ISSUE #16: DISBURSEMENTS ARE NOT PROCESSED IN A TIMELY MANNER. I/T'S HAVE NOT RECEIVED PINK SLIPS FROM BUSINESS OFFICE.**
The list of I/T's with this issue is attached to this agenda.

**SUGGESTION/RESOLUTION REQUESTED:**
The population would like for the business office to ensure that disbursements are processed in a timely manner.

**ISSUE #17: ORGANIZATIONAL COMPUTER PRINTERS ARE NOT WORKING PROPERLY.**

**SUGGESTION/RESOLUTION REQUESTED:**
Open to discussion

**ISSUE #18: ILC IS MAKING A REQUEST (CORRECTION LAW §138(6)) TO THE COMMISSIONER: (1) INCREASE COMMISSARY BUY LIMIT TO $100, AND INCREASE PRICE OF VALUE OF FOOTWEAR TO $100 BASED ON PRICE INCREASES DUE TO INFLATION AND SUPPLY CHAIN DISRUPTIONS.**

**SUGGESTION/RESOLUTION REQUESTED:**
Open to discussion

**ISSUE #19: HBA AND HB5 ICE MACHINES ARE INOPERABLE**

**SUGGESTION/RESOLUTION REQUESTED:**
Open to discussion

## REVISITED ISSUES

**ISSUE#1: THE ILC HAS SUBMITTED AN FRP AND COMMISSARY AGENDAS AND REQUESTS SUBCOMMITTEE MEETINGS.**

**ISSUE#2: THE ILC HAS SUBMITTED A MOVIE DONATION PROPOSAL. IT WAS DENIED. THE ILC HAS NO WAY TO PURCHASE NEW RELEASE MOVIES FOR THE POPULATION OR THE FRP. THE ILC IS OPEN TO ADMINISTRATIVE SUGGESTIONS.**

**ISSUE#3: THE POPULATION REQUESTS ACCESS TO THE AUDITORIUM TO SHOW MOVIES AND FOR BANQUETS.**

**ISSUE#4: THE POPULATION REQUESTS THAT BANDS ARE ALLOWED TO RECONVEIN USE OF THE MUSIC ROOM IN THE EVENING MODULE.**

**ISSUE #5: WE WOULD LIKE THE DETERMINATION REGARDING THE PHONE TABLETS IN THE INFIRMARY FROM LAST MONTH'S AGENDA TO BE INSERTED IN THIS MONTHS MINUTES.**

**ISSUE #6: OUSTANDING PURCHASE ORDERS**

The ILC has written to the administration concerning this matter. In particular cases, either received items have been withheld by security staff for long periods of time or orders has not been made by administrative staff for the following purchase orders for the FRP: IBF21013, OT21113, OT21125, and OT21131.

**SUGGESTION/RESOLUTION REQUESTED:**

The storehouse should notify ILC or Incarcerated Individual Organizations when items have arrived. Received items should be placed into the FRP, and other areas, in a timely manner.

**ISSUE #7: COLLEGE GALLERIES**

**SUGGESTION/RESOLUTION REQUESTED:**

Open to discussion

Anthony Arriaga
06-A-0542
ILC Chairman

Michael Jones
90-A-5292
ILC Secretary

Sgt. Richardson
ILC Staff Advisor

To:     M. Capra, Superintendent
        C. Nixon, A/DSS

Fr:     Incarcerated Liaison Committee

Dt:     April 4, 2022

Re:     Unprofessional female staff

In Issue #1 of the March 2022 ILC Agenda and Issue #8 of the April 2022 ILC Agenda we presented an issue pertaining to female staff acting unprofessionally and in violation of NYSDOCCS Employee Manual.

Here is the list of the female staff in question and related unprofessional conduct:

1)      C.O. Harris (Female Officer at FRP Processing Trailer) - inappropriate and unprofessional communications, cursing, screaming, extremely negative attitude/demeanor towards families participating in FRP.

2)      C.O. B. Ellis – inappropriate and unprofessional communications, cursing, screaming, extremely negative attitude/demeanor, ignoring I/I's in need, hanging out, leaving her post to hang out in other areas without properly being relieved and not signing in their presence in that area in the appropriate logbook.

3)      C.O. Bailey – i nappropriate and unprofessional communications, cursing, screaming, negative attitude/demeanor, ignoring I/I's in need, hanging out, leaving post to hang out in other areas without properly being relieved and not signing in their presence in that area in the appropriate logbook.

4)      C.O. P. Siegler – never wears a mask, inappropriate and unprofessional communications, extremely negative attitude/demeanor, racial slurs, denying/interfering with I/I's attending religious services.

5)      C.O. M. Ford – inappropriate and unprofessional communications, abusive language, negative attitude/demeanor towards I/I's.

6)      C.O. Boone – inappropriate and unprofessional communications, cursing, screaming, negative attitude/demeanor.

7)      C.O. Greene – cursing (always saying "suck my d**k"), screaming, negative attitude/demeanor.

STATE OF NEW YORK
DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION
SING SING CORRECTIONAL FACILITY
INCARCERATED LIAISON COMMITTEE

Staff Advisor: Sgt. C. Giribaldi
Chairperson: Anthony Arriaga
Secretary: Michael Jones

To:   Michael Capra, Superintendent
Fr:   Incarcerated Liaison Committee
Dt:   April 20, 2022
Re:   **AMENDED ILC Agenda - April 2022**

Pursuant to Directive #4002, which deems the Incarcerated Liaison Committee legislative in function, the following constitutes the issues brought forth to this administration for legislation, clarification or resolution.

**ISSUE#1: COMMUNICATION BETWEEN THE ADMINISTRATION AND THE ILC:**

**ILC SUGGESTIONS:**
Open to discussion

Anthony Arriaga
06-A-0542
ILC Chairman

Michael Jones
90-A-5292
ILC Secretary

Sgt. Richardson
ILC Staff Advisor



NEW YORK STATE | **Corrections and Community Supervision**

ANTHONY J. ANNUCCI

KATHY HOCHUL
Governor

## INCARCERATED INDIVIDUAL LIAISON COMMITTEE MEETING MINUTES
### April 2022

**Present:**
M. Capra, Superintendent
J. Wood, FDS
A. Helms, DSA
C. Nixon, Captain Acting DSS
E. Velez, ADSP
B. Thorpe, DSS
L. Jackson-Smith  DSH
H. Richardson, IILC Staff Advisor

| | |
|---|---|
| Chapman, T | #09A2676 |
| Wilson, J | #07A8212 |
| Hall, D | #14A5057 |
| Salley, S | #02A4785 |

**Superintendent Capra discussed**
- No positive COVID cases reported, COVID protocols still in place
- Facility staff preparing for 3-day PREA Audit this week
- Serious contraband continues to be recovered through out facility, ILLC members need to remind population that incarcerated individuals who are found with serious contraband will be transferred out of facility
- Central Office is conducting a survey to assess the availability of fresh produce through commissaries
- 5/6/22 Carnegie Hall Concert is scheduled
- 8/24/22 Common and John Legend Concert is confirmed
- Puppies behind Bars program planning stages to start early Fall

*Superintendent Capra reviewed memo issued by*
**Anthony J. Annucci, Acting Commissioner**
Incarcerated Individual Packages

Issue #1 The ILC would like to increase constructive dialogue between the ILC and the administration at every level.
**Response**
Administration agrees and will continue to use this opportunity for open dialogue for solutions to systemic issues as well as new ideas/suggestions.  Superintendent Capra reminded IILC members that IILC position is not a platform used for personal issues.

Issue #2 Package Room/Footwear
**Response**
Captain Nixon stated he will investigate the package receipts issue presented on agenda

Issue #3 Search Team confiscates footwear
**Response**
Superintendent Capra explained footwear that is determined over allowable price will be confiscated.  Superintendent Capra added due to increase of recovery of serious contraband search teams will continue to be randomly deployed.

Issue #4 Incarcerated Individuals would like clarity on the loss of recreation privileges
**Response**
**Superintendent Capra stated out of cell program will be considered recreation privelges.**

Issue #5 Television repair, resale program or package variance
**Response**
**Administration stated this program proposal would need to be approved by Central Office**

Issue #6 Organizations request to purchase or be provided their own computers for organizational use
**Response**
**Administration denied this request**

Issue #7 Organizations request increase in allowable spending for the upcoming events in May and June 2022
**Response**
**DSA Helms stated to IILC members need to be mindful when ordering extra food items for events. DSA Helms stated this will need to be within reason due to health issues, special diets concerns, and it can't become gluttonous, or it will be denied.**

Issue # 8 "Removed due to violation of IILC By Laws

Issue #9 Law Library passes
**Response**
**Administration denied requests**

Issue #10 Law Library Hand Sanitizer
**Response**
**ADSP Velez stated a hand sanitizer dispenser will be placed at the entrance of Law Library**

Issue #11 Law Library Floor Plans
**Administration denied requests**

Issue #12 Law Library Incoming CD's/DVD/USB Thumb drives
**Response**
**ADSP Velez state new equipment is being purchased to assist in reviewing legal materials**

Issue #13 Inmate visitor program issue/concerns
**Response**
**ADSP Velez stated system has been corrected.**

Issue # 14 Inmate visitor program visitation concerns
**Response**
**Superintendent Capra explained any changes to visit room procedures still comes directly from Central Office not facility level**

Issue #15 Outside Pavilion reopening
**Response**
**Superintendent Capra explained once weather is consistent temperatures in the 70%'s we will open outside visiting pavilion**

Issue #16 Disbursements are not processed in a timely manner
**Response**
**Administration stated facility is short staffed.  Last week Central Office Budget and Finance staff were at facility assisting with inputting of back log of disbursements.**

Issue #17 Organizational Computers printers are not working properly
**Response**
**Administration stated this will be assessed by maintenance staff**

Issue #18 ILC is making a request to the Commissioner for increase commissary buy to $100 and increase price of value of footwear to $100 due to inflation and supply chain disruptions.
**Response**
**Administration stated this request should be forwarded directly to Central Office for approval**

Issue #19 HBA and HB5 ice machines are inoperable
**Response**
**DSA Helms stated company will work on attempting to repair ice machines before pursuing purchasing new ice machines.**

Revisited Issues

Issue #1 The ILC has submitted an FRP and Commissary agenda and requests subcommittee meetings.
**Response**
**Administration stated due to facility being short staff both subcommittees' meetings have been put on hold**

Issue #2 The ILC has submitted a movie donation proposal it was denied.  ILC has no way to purchase new release movies for the population or FRP.  The ILC is open to administrative suggestions.
**Response**
**Superintendent Capra stated ILC members need to resend movie donation proposal to FDS Wood for review and approval.**

Issue #3 The population requests access to the auditorium to show movies and for banquet's
**Response**
**Superintendent Capra denied this request.**

Issue #4 The population requests that bands are allowed to reconvene use of the music room in the evening module.
**Response**
**Superintendent Capra stated due to COVID protocols the above requests can not be considered at this time.**

Issue #5 We would like the determination regarding the phone tablets in the infirmary from last months agenda to be inserted in this month's minutes.
**Response**
**DSH Jackson stated the tablets are for I/I's that are unable to utilize the phone on the unit. If there is a question to whom is capable, the Medical Provider on the unit (RN may report) will be responsible to determine.**
Issue #6 Outstanding Purchase Orders
**Response**
**Superintendent Capra stated facility business office is short staffed and we appreciate your patience and understanding**

Issue #6 College Galleries
**Response**
**Superintendent Capra stated IILC members should send proposal to FDS Wood for review.**



_____          _____
 Superintendent                                                      Date


_____          _____
 ILC Member                                                           Date
MC:mb
cc:     J. Collado, Acting Asst. Comm.              ILC Chairman
         M. Damore, CIU Director                         Exec Team    ILC Sgt.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
ANTHONY ARRIAGA,

                                    Plaintiff,

                                                                **DECLARATION OF SERVICE**

                vs.
                                                                23-CV-1941 (VB)

ANTHONY ANNUCCI, ET AL.

                                    Defendant.
-------------------------------------------------------------------X
I, Anthony Arriaga, the undersigned, declare:

1.      I am the Plaintiff in the above entitled action.

2.      I served the within documents: Second Amended Complaint (42 U.S.C. §1983),
        Attachments
        by placing true exact copies thereof in a sealed envelope in the prison mail for delivery
        by First Class Mail via U.S. Postal Service to the following:

        United States District Court
        Southern District for New York
        Pro Se Intake Unit
        500 Pearl Street, Room 200
        NYC, New York 10007

        Dian Kerr McCullough
        Assistant Attorney General
        44 South Broadway, 5th Floor
        White Plains, New York 10601

3.      I further certify under penalty of perjury that the foregoing is true and correct pursuant to
        28 U.S.C. §1746.

Executed on:  July 27, 2023
                Fallsburg, New York

                                                                Anthony Arriaga
                                                                DIN: 06-A-0542
                                                                Sullivan Correctional Facility
                                                                P.O. Box 116
                                                                Fallsburg, New York 12733

15:23:17 Friday, August 5, 2022

```
08/05/22 CCLMJJB          INMATE TRANSFER SYSTEM                  KITSM31
15:23:09 C999N098       3.1. - CURRENT STATUS INQUIRY     REVIEW 2207003194
DIN: 06A0542   NAME: ARRIAGA, ANTHONY          OWNING FAC: SULLIVAN
------------------------- LOCATION: SULLIVAN    ---------------------------
SENDING FAC: 070 SING SING GN DATE: 06/03/22
REF. REASON: PROGRAM PURPOSES-GEN CONFINE
SEC LVL: MAX 01  OMH LVL: 6   MED LVL: 3
TRANSFER CONSIDERATIONS:
        (                                                      )
        (                                                      )
EXPLANA-  ( ARRIAGA 06A0542 HAS BEEN IN SING SING SINCE 7/8/2011. ARRIAGA IS )
TION FOR  ( OVER FAMILIAR WITH FACILITY AND STAFF. I/I USES OVERFAMILIARITY T )
TRANSFER: ( O MANIPULATE OTHER, MORE VULNERABLE I/IS. ARRIVED IN HUB VIA AREA )
          ( PREFERENCE TRANSFER.                                          )
PRIORITY TRANSFER: YES       SPECIFIC FACILITY:
REV: _ BSA   _ HUB   _ TRL   _ CLM   _ HS   _ MH   _ SH   _ IG   _ DCCF
ANALYST REVIEW:
   DECISION:     A 44  06/06/22   APPROVAL PROGRAM PURPOSES-GEN CONFINE
   SEC. CLASS:   01 MAX A    OMH SRVC LEVEL: 6   MEDICAL SRVC LEVEL: 3
   T.O. DATE:    06/06/22   FACILITY: SULLIVAN       ANALYST: CCLMKET
   TRANSFER HOLD:                          DATE:

T.O. CLOSED    07/19/22                                 OPTION: . . .
<ENTER>   <PF3> EXIT(FUNCT)   <PF4> RETURN             NEXT DIN: _____
```



NEOPOST
07/31/2023
US POSTAGE $003.27⁰
FIRST-CLASS MAIL

ZIP 12733
041M11467960

SULLIVAN CORRECTIONAL FACILITY

A. Arriaga
DIN: 06-A-0542
Sullivan C.F.
P.O. Box 116
Fallsburg, New York 12733

To:   United States District Court
      Southern District for New York
      Pro Se Intake Unit
      500 Pearl Street, Room 200
      NYC, New York 10007



RECEIVED
AUG - 2 202
PRO SE OFFICE

**LEGAL MAIL**
Privileged & Confidential